IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAID MUHAMMAD HUSYAN QAHTANI,       )
                                    )
                                    )
              Petitioner,           )
                                    )
       v.                           )        Civil Action No. 05-2384 (RWR)
                                    )
GEORGE W. BUSH, *et al.,*            )
                                    )
              Respondents.          )
_____)

## DECLARATION OF TERESA A. McPALMER

Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate General's Corps, United States Navy, hereby state that to the best of my knowledge, information, and belief, the following is true, accurate and correct:

1.      I am the Legal Advisor to the Office for the Administrative Review of the Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.      I hereby certify that the documents attached hereto constitute a true and accurate copy of the portions of the record of proceedings before the Combatant Status Review Tribunal related to petitioner Said Muhammad Husyan Qahtani that are suitable for public release. The portions of the record that are classified or considered law enforcement sensitive are not attached hereto or were redacted by an OARDEC staff member. This staff member also redacted information that would personally identify certain U.S. Government personnel in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  _24 May 2006_                         _Teresa A. McPalmer_
                                              Teresa A. McPalmer
                                              CDR, JAGC, U. S. Navy



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 9 0 3

2 9 FEB 2005

~~FOR OFFICIAL USE ONLY~~

From: Director, Combatant Status Review Tribunal

Subj: **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 200**

Ref: (a) Deputy Secretary of Defense Order of 7 July 2004
(b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #200 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

UNCLASSIFIED

25 Jan 05

MEMORANDUM

From:  Assistant Legal Advisor
To:    Director, Combatant Status Review Tribunal
Via:   Legal Advisor

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN #200

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl:  (1) Appointing Order for Tribunal #12 of 29 Sep 2004
       (2) Record of Tribunal Proceedings

1.  Legal sufficiency review has been completed on the subject Combatant Status Review Tribunal in accordance with references (a) and (b).  After reviewing the record of the Tribunal, I find that:

    a.  The detainee was properly notified of the Tribunal process and elected to participate in the CSRT by attending the CSRT, and providing a sworn statement, which consisted of responses to the allegations set forth in Exhibit R-1 to Encl. (2).  In addition, the detainee responded to questions posed by his personal representative and by Tribunal members.  *See* Enclosure (3) to Encl. (2).

    b.  The Tribunal was properly convened and constituted by enclosure (1).

    c.  The Tribunal substantially complied with all provisions of references (a) and (b).

    d.  Note that some information in Exhibits R-13 through R-15 was redacted.  The FBI properly certified in Exhibit R-2 that the redacted information would not support a determination that the detainee is not an enemy combatant.

    e.  Exhibits R-4 through R-6, R-13 and R-15 contain handwritten notes in the margins.  These notes appear to be aids in directing the Tribunal to the source of information contained in the Unclassified Summary provided to the detainee.  These notes do not alter the evidence, nor do they affect the legal sufficiency of the evidence.

    f.  The detainee did not request that any witnesses or documentary evidence be produced.

    g.  The Tribunal's decision that detainee #200 is properly classified as an enemy combatant was unanimous.

    h.  The detainee's Personal Representative was given the opportunity to review the

UNCLASSIFIED

UNCLASSIFIED

Subj:   LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 200

record of proceedings and declined to submit post-tribunal comments to the Tribunal.

2. The proceedings and decision of the Tribunal are legally sufficient, and no corrective action is required.

3. I recommend that the decision of the Tribunal be approved and the case be considered final.

KAREN M. GIBBS
CDR, JAGC, USNR

UNCLASSIFIED



### Department of Defense
#### Director, Combatant Status Review Tribunals

29 Sep 04

From: Director, Combatant Status Review Tribunals

Subj: APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref: (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

MEMBERS:

███████████████, Colonel, U.S. Marine Corps Reserve; President

███████████████, Lieutenant Colonel, JAGC, U.S. Army;
Member (JAG)

███████████████ Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy



# HEADQUARTERS, OARDEC FORWARD
### GUANTANAMO BAY, CUBA
### APO AE 09360

MEMORANDUM FOR DIRECTOR, CSRT                    21 January 2005

FROM:  OARDEC FORWARD Commander ICO ISN 200

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ███████.

CHARLES E. JAMISON
CAPT, USN

~~SECRET//NOFORN//X1~~

## (U) <u>Combatant Status Review Tribunal Decision Report Cover Sheet</u>

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL: ___#12___

(U) ISN#: ___200___

Ref:    (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
       (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
       (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:    (1) (U) Unclassified Summary of Basis For Tribunal Decision (U/~~FOUO~~)
       (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
       (3) (U) Summary of Detainee Testimony (U/~~FOUO~~)
       (4) (U) Copies of Documentary Evidence Presented (S/NF)
       (5) (U) Personal Representative's Record Review (U)

1. (U) This Tribunal was convened on 23 October 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 23 October 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #200 is properly designated as an enemy combatant, as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is a member of, or affiliated with, both Taliban and al Qaida forces that are engaged in hostilities against the United States and its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//FOUO

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12_____
ISN #: _____200_____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with, both Taliban and al Qaida forces that are engaged in hostilities against the United States and its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The Tribunal held this hearing on 23 October 2004. The Recorder presented Exhibits R-1 and R-2 during the unclassified portion of the Tribunal. The primary exhibit, the Unclassified Summary of Evidence (Exhibit R-1), alleged, among other things, that the Detainee is associated with al Qaida and the Taliban; the Detainee traveled from Saudi Arabia to Afghanistan multiple times during the period between 2000 and 2001 and received training on the Kalashnikov assault rifle, PK machine gun, and Rocket Propelled Grenades (RPG) at the Kubah training camp; the Detainee returned to Afghanistan in April 2001 after hearing a fatwa concerning assisting the Taliban; the Detainee admitted spending 7-10 days with a high ranking al Qaida official at a safe house located in Rawalpindi, Pakistan in May 2000; the Detainee participated in military operations against the coalition; the Detainee received military training in small arms, armor, and tactics at Taliban training camps; the Detainee served with a Taliban unit on the front lines near Kabul, Afghanistan; and, after fleeing through the Tora Bora region, the Detainee was captured by Pakistani Forces on 18 December 2001 near Parachinar, Pakistan.

The Detainee, after starting the Tribunal using the Arabic translator, elected to respond in English for a majority of the questioning phase of the Tribunal. While the Detainee's proficiency in English was very good, all formal portions of the proceeding were conducted through the translator in Arabic. The Detainee noted that he learned most of his English (maybe 80%) while in Cuba. The Detainee, both through his Personal Representative and by himself, admitted to responding to the fatwas to support the Taliban and felt there was nothing wrong with doing so. He disagreed with several portions of the Unclassified Summary of Evidence and provided clarification;

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

specifically, 1) the Kubah training camp was in Pakistan, 2) initial travel to Afghanistan was not for training; rather, training was initially conducted in Pakistan, 3) while the Detainee stayed at a safehouse in Rawalpindi, Pakistan, he had no idea that the operator and owner of the house was a high ranking al Qaida official, 4) while serving on the front lines, he stated that he only performed guard duty and never had to fire a shot or protect himself and 5) in leaving Afghanistan for Pakistan, he was not running away; but, basically leaving with a group of people that were no longer fighting, and (6) he was not captured by Pakistani forces but turned himself in to what he described as a police station. He admitted to supporting the Taliban.

### 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a, R-1 to R-18.

    b. Testimony of the following persons: Sworn statement of the Detainee. See Enclosure (3) to the CSRT Decision Report.

### 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested no witnesses and no additional evidence to be produced; therefore, no rulings on these matters were required.

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

    a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

    b. Essentially, the only unclassified evidence the Tribunal had to consider was the Detainee's sworn verbal testimony. A summarized transcript of the Detainee's sworn testimony is attached as Enclosure (3) to the CSRT Decision Report. In sum, the Detainee testified that he did support the Taliban and associated with al Qaida personnel.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

### 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

### 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary.

b. The Detainee understood the Tribunal proceedings. He asked no questions regarding his rights and actively participated in the hearing.

c. The Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with, both Taliban and al Qaida forces that are engaged in hostilities against the United States and its coalition partners.

### 8. Dissenting Tribunal Member's report

None. The Tribunal reached a unanimous decision.

Respectfully submitted,

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

### Detainee's Preliminary Comments

Tribunal President: Do you have any questions at this time concerning the Tribunal process?

Detainee: I asked two previous questions to my Personal Representative. First, how trustworthy is this Tribunal? Is it trustworthy?

Tribunal President: Yes, it is very trustworthy. You witnessed the swearing in of the Tribunal members.

Detainee: Previously, some people were released without having a Tribunal. They were worse than the people that are still here.

Tribunal President: I understand what you are saying. Our responsibility today is to convene this Tribunal and make a determination on your classification as an enemy combatant. I cannot speak to what has occurred prior to this, about other cases.

Detainee: I'm ready.

Tribunal President: Very well, thank you. If at anytime you have questions feel free to ask. Again to clarify, we have no control over other Detainees or why they may have been released. There may be other reasons we are not aware of. Today we are going to focus on determining the classification of enemy combatant status in your particular situation.

*After the Recorder provided a summarized version of the Unclassified Summary, the Personal Representative made the following comment.*

Personal Representative: Sir, I would like to make a clarification on the Unclassified Summary.

Tribunal President: On what?

Personal Representative: On one of the pieces of the unclassified evidence to help you understand it when you read it as to a location to the activities.

Tribunal President: Go ahead.

Personal Representative: When you read point 3.a.1, where it states Detainee traveled from Saudi Arabia to Afghanistan multiple times between these periods to receive a particular training at the Kubah training camp. One may lead us to believe that camp is in Afghanistan, that camp is actually in Pakistan. I am not disputing any of the training the Detainee received; I just want you to be certain as to the location; it is in Pakistan.

UNCLASSIFIED//FOUO

Tribunal President: We've got it. Thank you.

**Detainee's Sworn Statement**

*The Detainee provided the following statement after electing to be sworn:*

Personal Representative to Detainee: Would you desire that we read each of the points individually and allow you to comment?

Detainee: Yes. Regarding point 3a.

Personal Representative: The clarification that the training camp was in Pakistan and the Detainee did travel to Afghanistan but not to go to that camp.

Detainee: That is not all I wish to say.

Personal Representative: Please continue.

Detainee to Personal Representative: When we were talking about 3.a, and I told you it was just one thing.

Personal Representative: Detainee admitted he spent a day with an al Qaida official at this house in Pakistan. I believe the Detainee's point was: just because somebody stays at someone's house, who may not be the best person in the world, does that make the people who stayed at that house bad people?

Detainee: Yes, that is what I wanted to say.

Personal Representative to Detainee: That you did stay at the house.

Detainee: Yes, I stayed with him for about seven to ten days and just because I stayed with him, that doesn't make me one of them. Yes, I was with the Taliban. Everything on the Unclassified Summary is information I have given. I was trying to be truthful and honest. That's all.

Personal Representative: The other point the Detainee and I talked about during our meeting was that Saudi Arabia, Pakistan, and the United Arab Emirates recognized the Taliban government in Afghanistan just about up until 11 September 2001. The Detainee's travels were in the year 2000. The Detainee and many other people received different types of weapon training. That is what people did.

The point on paragraph 3.a.1 is that the Detainee did go to Afghanistan, but that was when it was a recognized government by his own government, and it was prior to the 11 September 2001 attacks.

UNCLASSIFIED//~~FOUO~~

Detainee: There is something I want to correct. Regarding 3.a.1, the training camp was not in Afghanistan it was in Pakistan. I told them about it before. I have traveled from Saudi Arabia three times. The first time I traveled to Pakistan. It isn't mentioned here and for that reason, I wanted to mention it. The other two times I traveled, it was to Afghanistan.

Paragraph 3.a.2, I returned to Afghanistan in April 2001 after hearing a fatwa concerning assisting the Taliban. That is correct. I went to Saudi Arabia and talked to Islamic scholars and talked to them about what was happening and they advised me to go to Afghanistan.

Paragraph 3.a.3, yes, I said I was with one of the persons in Rawalpindi, but at that time I didn't know he was from al Qaida. Someone had sent me there, and that doesn't mean I am al Qaida, just because I saw him and visited with him.

Paragraph 3.b.1, yes, I went to the training camp. The military training and small arms is correct but it wasn't at a Taliban camp. I did receive armor training at a Taliban camp.

Paragraph 3.b.2, yes, I was with the Taliban and I was in the front lines. I will talk about this later.

Paragraph 3.b.3, I already discussed this with my Personal Representative and he can explain it to you.

Personal Representative to Detainee: Yes, I would like your help because I think the way this is worded, the person that looked at the information may not have worded this properly. It states that after fleeing through Tora Bora region, the Detainee was captured by Pakistani forces on 18 December 2001 near Parachinar, Pakistan. From what I understand, that implies the Detainee was fleeing and to the point where they overcame him and he was captured, and that is not the case. Correct?

Detainee: Yes, because the situation in Afghanistan was such that no one could stay there. I went to Pakistan and I didn't have my thing that helps me get back to my country (passport). I went to the Pakistani police station by myself. They didn't capture me. This isn't correct. I went by myself.

Personal Representative: The point of clarification for the record is the Detainee voluntarily went to the Pakistani police station and because of all the trouble that was occurring, he said, here is who I am, I need your help.

Detainee: I asked them to take me to the Saudi Embassy so I could go back to my country.

Personal Representative: When you look at the details of the record and the details of the file, please take that into consideration the Detainee's side to why some of these

ISN# 200
Enclosure (3)
Page 3 of 12

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//FOUO

paragraphs of the Unclassified Summary may be misleading from the Detainee's perspective. And when you do, please look at it from this perspective.

Tribunal President: Certainly. That is why we welcome participation from individuals, so we can hear their story and have them provide us their interpretation of their activities during the time period in question. We come in here with an open mind, and we haven't seen any evidence pertaining to you until now. We also receive your statement with an open mind. We take all that and give it serious consideration as we make our determination of your enemy combatant status.

Detainee: I would like to say something. Even if you say I am right or wrong, I don't think I did anything wrong. At the time I didn't think I did anything wrong, and I still don't. I didn't do anything illegal or bad to anyone. I want you to understand this.

Tribunal President: We will take that into serious consideration. Does this conclude your statement at this time?

Detainee: If you want to ask me anything, but now, I have nothing else to say.

Personal Representative to Detainee: They will give you an opportunity to answer questions to help them further clarify.

*When asked by the Tribunal President if the Personal Representative had anything else to add, the Personal Representative made the following remark:*

Personal Representative to Detainee: Related to the statement you made and to help us all understand the point on the Unclassified Summary 3.a.3, you said to me and you relayed to the Tribunal that you did stay at an al Qaida person's home. You admitted that. The question I have for you (Detainee): when you made this admission, did you admit staying at a high ranking al Qaida home, or that you stayed at somebody's home but you didn't know what rank they were?

Detainee: I met him there and it was his home. At the time, I didn't know who he was. He has a different name than the one given by the Americans. His name is Tariq. I didn't know him or anything about him at that time.

Personal Representative to Detainee: So, you didn't know he was a high-ranking al Qaida official.

Detainee: I didn't know anything about him. When they (interrogators) showed me his picture, I told them I knew who he was and that I had met him at his home, and I told them what had happened. They told me his name was Abu Zubaydah and he was one of the famous people of al Qaida.

UNCLASSIFIED//FOUO

Personal Representative to Detainee: The point I want to make clear, it says you admitted staying seven to ten days with a high ranking al Qaida official.

Detainee: I just said I was with the guy in his home.

Personal Representative: The interrogators and people that wrote the Unclassified Summary, once they found out who it was, said he was a high-ranking official.

Detainee: Yes.

Tribunal Member to Personal Representative: Did you want to clarify 3.b.2, with the Detainee?

Personal Representative: Did I want to clarify 3.b.2?

Tribunal Member to Personal Representative: the Detainee said you were going to explain that to us.

Personal Representative to Detainee: Did you need me to explain something regarding 3.b.2, that you served with a Taliban unit on the front lines near Kabul?

Detainee: Did I say that?

Tribunal Member: Yes, you said I told my Personal Representative and he will tell you later.

Detainee: I told my Personal Representative I would talk about it.

Personal Representative to Tribunal members: Yes, the Detainee told me he would tell you. The Detainee told me some things in the interview, but there were things he wanted to tell you directly, and that was one. Yes, he did serve there.

Detainee: Yes, I was with the Taliban in Afghanistan. I didn't think anything was wrong with that at the time and I still don't. I went to the front lines, but I didn't stay there for very long. I can't remember exactly how long I was there. I saw everything with my own eyes and I was smart enough to know what was going on over there.

## Questions to Detainee by Tribunal Members

Q:      How long were you fighting in the war?

A:      I never mentioned I was fighting.

Q:      Did you see conflict when you were over there at all?

UNCLASSIFIED//~~FOUO~~

A:     Maybe, but it was another side that I saw. (Inaudible)

Q:     What did you do before you went to Afghanistan?

A:     I was a student.

Q:     What were you studying?

A:     Islamic law.

Q:     After speaking with the Sheik and scholars, you decided it was the right thing to do, your duty to go to Afghanistan?

A:     They didn't say it was my duty, they said they saw nothing wrong with me going to help the Taliban.

Q:     What kinds of things were you intending to do for the Taliban, military support or other things?

A:     I was thinking about training. It wasn't on my mind to go to the front line or anything like that, but sometimes when you are at a place (I'm not going to say interesting) you want to see what is going on.

Q:     Did you ever receive any training before you left Saudi Arabia? Or was the first time when in Pakistan?

A:     What do you mean by training?

Q:     Military.

A:     No. I am from the Saudi region and everyone knows how to use the Kalashnikov.

Q:     Did you receive any injuries?

A:     No.

Q:     You were never taken prisoner in Afghanistan? The first time you were captured was when you turned yourself in?

A:     Yes.

Q:     Did you have your passport when you made it to Pakistan?

A:     No.

UNCLASSIFIED//~~FOUO~~

Q:    Where was your passport?

A:    I gave it to a Pakistani guy.  I told him I would meet him at the first place when we came from Saudi Arabia, but unfortunately I didn't make it.

Q:    That was from Saudi Arabia to Pakistan?

A:    Yes.

Q:    You left your passport in Pakistan?

A:    No.  It was with me for most of the time, and then I gave it to someone to hold.  I told him I would return to (inaudible), a city in Pakistan.  Now, I am here.

Q:    In helping the Taliban, it appears that your form of help was going to be physical support or military support for the Taliban?

A:    I didn't say that.

Q:    I am asking.  You went to Afghanistan to help the Taliban?

A:    Yes.

Q:    Did you donate money?

A:    No, I didn't have money.  I just wanted to go and see.  The first time I went to Pakistan, I didn't know anything about the Taliban.  I didn't agree about the fighting between them and the Northern Alliance.  For this reason, I went from Pakistan to Afghanistan to see what was happening there.  I went back to Saudi Arabia and the Imam, and explained everything I had seen.  They were already briefed about what had happened in Afghanistan.  After I finished explaining to them, I was told I could go and help.  They were at war for a long time and it is time for them to be at peace.  They have been at war for about twenty-five to thirty years.  After they finished fighting the Russians, there was the civil war.  Then, after that, when the Taliban arrived, they brought peace to ninety-five percent of the country, except the places the Northern Alliance were at the time.  I don't think there was anything wrong with helping to make peace after thirty years of fighting.

Q:    In 3.b.3 of the Unclassified Summary, you turned yourself in to the Pakistani police station on 18 December.  When did you begin to leave Afghanistan?  Was it December first or sometime before that or after that?

A:    Of course it was before, but I can't remember the dates because we use a different calendar.

UNCLASSIFIED//FOUO

Q:     Can you tell me how many weeks before this date?

A:     I don't know.  About a month, and three to five days.  Thirty to forty days.

Q:     Explain to me how you were hoping to help the Taliban?  I understand you went to Afghanistan twice.  You went back to Saudi Arabia and told about what you had observed.  Then you went back to Afghanistan?

A:     The first time it was to Pakistan.  While I was in Pakistan, I learned what was happening in Afghanistan.  I went back to Saudi Arabia before I got the Fatwa.  The second time I traveled, I didn't have time to get the Fatwa.  I went back to Pakistan and with people from Pakistan went to Afghanistan to see what was happening.  I spent about seven to eight months there.

Q:     While you were in Afghanistan, how did you help the Taliban?

A:     To be honest, nothing.

Q:     You were just an observer?

A:     Yes.  Not just an observer, but I had nothing in my hands to do.  Going from place to place was something for me to do.  It was for my own (I'm not quite sure how to put it) knowledge.

Q:     Did they offer you a weapon?  Did they want you to carry a weapon at any time in Afghanistan?

A:     I had a weapon in Afghanistan, but not all the time.  I bought it myself.

Q:     When you were with the Taliban unit, were you actually on the fighting lines of the front line?

A:     I went to guard the front line, but at the time, there wasn't any fighting.  There wasn't any fighting during the time I was in Afghanistan.

Q:     Did you help out with guard duty or anything like that?

A:     Yes.

Q:     And you would have had a weapon at that time?

A:     Yes.

UNCLASSIFIED//FOUO

Q:    Why did you give up your passport?  Why didn't you keep it yourself?  Wouldn't it have helped you in getting across the border and into Pakistan?

A:    One way or another I knew at the time I wasn't going to cross the border with or without a passport.  I knew at the time the Pakistani government was gathering people whether they were involved in anything or not.  The American government had said if anyone catches anyone they would pay five thousand dollars.

Q:    Still, don't you think you would have a better chance by retaining your passport?

A:    No.  Not at that time.  Now if I think about it, it's too late, it's already gone.  Maybe I would have made a different choice but at that time, that was the choice I made.  I thought if I didn't have my passport or money they wouldn't think I was Afghani and they would let me pass.

Q:    You thought maybe you would have a better chance if you didn't have your passport?

A:    (inaudible) Detainee laughs.

Q:    You were hoping to link up with the person you gave your passport to?

A:    Yes.  We were going to meet up.  I gave him my family phone number and I asked him to tell them to send me money so I could get back to Saudi Arabia, but nothing happened.

Q:    You never saw him again?

A:    No.

Q:    When you crossed the border into Pakistan, back from Afghanistan into Pakistan, were there others with you?

A:    Yes.

Q:    How many?

A:    Some of them are here.

Q:    How many in the group were with you when you crossed the border?

A:    I can't remember.  Two of them are with me in Camp 4.  There are some people in the other camps.

Q:    Were there fifteen in your group?

UNCLASSIFIED/~~FOUO~~

A:    Maybe less.

Q:    Less?

A:    Maybe.

Q:    Once you crossed the border, you separated?  You said you turned yourself in.

A:    We went together.  We discussed what we should do now.  We decided to go to the Pakistani police so they would turn us over to our embassies.

Q:    You went as a group to the police department?

A:    Yes.

Q:    Were you the leader of this group, or were you following?

A:    We were together.  There wasn't any leader.

Q:    There was no leader?

A:    We just walked together.

Q:    Trying to save yourself and get out of Afghanistan?

A:    Yes.

Q:    Where did you learn to speak English so well?

A:    Seventy-five percent here.

Q:    Did you study at all in Saudi Arabia?

A:    Yes.

**Personal Representative to Detainee:**

Q:    You had stated here that there were people that were with you when you turned yourselves in, that are in this camp.  I am interested as to when you had the opportunity to call witnesses?

A:    Yes, they were with me but they didn't know anything about where I was.  For this reason, I didn't think they would benefit me.

Q:    They couldn't say we all voluntarily turned ourselves in?

UNCLASSIFIED//FOUO

A:    I'm one hundred percent sure they could say it and I am sure they told the interrogators that. I told my interrogator they were with me.

Personal Representative: I just wanted to know why you didn't want to bring them here as witnesses.

Detainee: I don't have a problem if you want them to come here. They will say the same thing.

Q:    The Fatwa that was issued that had you decide to go to Afghanistan, what did that Fatwa say?

A:    It talked about what was happening with the war in Afghanistan and the Afghan leaders. They explained what the Taliban did. The Taliban made mistakes, but in general everything was acceptable.

Q:    The Fatwa did not say come and fight the Northern Alliance and bring arms against the enemy?

A:    I don't know exactly, but it supported the Taliban. I don't know if it mentioned fighting or not. I am sure they mentioned helping or supporting Taliban. I'm not sure if they mentioned fighting. I don't think they said that.

Q:    You had the rifle and you were on the front lines. You didn't fire, you were guarding. The question I have is, what if the forces came? What if they started shooting at you? I know it's hard to answer what if. You had to go there thinking I might have to fire my weapon?

A:    Of course if you are fighting, everything is acceptable. You think if someone comes to you, they will shoot you. Something like that.

Q:    You left before the fight started. Did you leave because either you were afraid for your life or you realized it was wrong?

A:    I left because everybody else left.

UNCLASSIFIED//~~FOUO~~

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.



Colonel, U.S. Marine Corps
Tribunal President

ISN# 200
Enclosure (3)
Page 12 of 12

UNCLASSIFIED//FOUO

# DETAINEE ELECTION FORM

**Date:** 18 October 2004

**Start Time:** 1030 hrs

**End Time:** 1140 hrs

**ISN#:** 0200

**Personal Representative:** ██████████, MAJOR, USAF
(Name/Rank)

**Translator Required?** YES        **Language?** ARABIC

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES

------------------------------------------------------------------------

## Detainee Election:

[X] **Wants to Participate in Tribunal**

[ ] **Affirmatively Declines to Participate in Tribunal**

[ ] **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee desires to participate in the Tribunal. Detainee will address the Tribunal himself and will respond to tribunal questions. No witnesses or documentary evidence are required. No Follow-up interview is required—CANCEL FOLLOW-UP INTERVIEW. A Final Interview is still required. Detainee speaks and reads English, but Translator is still required. Detainee was very cooperative, respectful, asked questions, and responded to all of my questions.

Personal Representative: ██████████████████

UNCLASSIFIED//FOUO        Exhibit *D-a*

UNCLASSIFIED

**Combatant Status Review Board**

TO: Personal Representative

FROM: OIC, CSRT (21 September 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – QAHTANI, Said Muhammed Husyan.

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that detainee is associated with al Qaida and the Taliban.

   a. The detainee is associated with al Qaida and the Taliban:

      1. The detainee traveled from Saudi Arabia to Afghanistan multiple times during the period between 2000 and 2001 and received training on the Kalashnikov assault rifle, PK machine gun, and Rocket Propelled Grenades (RPG) at the Kubah training camp.

      2. The detainee returned to Afghanistan in April 2001 after hearing a fatwa concerning assisting the Taliban.

      3. The detainee admitted spending 7-10 days with a high ranking al Qaida official at a safe house located in Rawlbandy, Pakistan in May 2000.

   b. The detainee participated in military operations against the coalition.

      1. The detainee received military training in small arms, armor, and tactics at Taliban training camps.

      2. The detainee served with a Taliban unit on the front lines near Kabul, Afghanistan.

      3. After fleeing through the Tora Bora region, the detainee was captured by Pakistani Forces on 18 December 2001 near Parachinar, Pakistan.

UNCLASSIFIED

1 OF 2

Exhibit  R-1

UNCLASSIFIED

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED

2 of 2

**Memorandum**                    *UNCLASSIFIED*



| | | | |
|---|---|---|---|
| To | : | Department of Defense<br>Office of Administrative Review<br>for Detained Enemy Combatants,<br>Col. David Taylor, OIC, CSRT | Date 10/06/2004 |

From : FBI GTMO
Counterterrorism Division,
Office of General Counsel,
Asst. Gen. Counsel ███████

Subject  REQUEST FOR REDACTION OF
███████ NATIONAL SECURITY INFORMATION
███████

     Pursuant to the Secretary of the Navy Order of 29 July 2004, Implementation of Combatant Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba, Section D, paragraph 2, the FBI requests redaction of the information herein marked[1]. The FBI makes this request on the basis that said information relates to the national security of the United States[2]. Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

     The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

     The following documents relative to ISN 200 have been redacted by the FBI and provided to the OARDEC, GTMO:

FD-302 dated 02/07/2002
FD-302 dated 02/09/2002
FD-302 dated 02/11/2002

---

   [1]Redactions are blackened out on the OARDEC provided FBI document.

   [2]See Executive Order 12958

*1 of 2*

UNCLASSIFIED

Memorandum from ████████ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 10/06/2004


         If you need additional assistance, please contact
Assistant General Counsel (████████████████████),
████████████████████████████  Intelligence Analyst (IA)
    or IA ████████ (████████████), ████████████████████

1 - ████████████
1 - ████████████
1 - ████████████
1 - ████████
1 - 315N-MM-C99050
1 - 315N-MM-C99102-AA117

RAG:rag

UNCLASSIFIED

UNCLASSIFIED//~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on __18__ January 2005 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #200.

 have no comments.

_____ My comments are attached.



_____, Lt Col, USAF

Name PERSONAL REP TEAM LEAD

Signature

FOR MAJ ████████

18 Jan 05

Date

ISN #200
Enclosure (5)

UNCLASSIFIED//~~FOUO~~