## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALIM SAID, et al., ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-CV-2384 (RWR) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| *et al.*, ) | |
| ) | |
| Respondents. ) | |

**RESPONDENTS' OPPOSITION TO
PETITIONERS' MOTION TO REQUIRE RESPONDENTS TO
(1) PRESERVE EVIDENCE RELATING TO PETITIONERS AND
(2) PROVIDE 30 DAYS' ADVANCE NOTICE OF
TRANSFER OR REMOVAL FROM US CUSTODY AT GUANTANAMO BAY**

Respondents hereby respond to petitioners' motion for preservation order and motion for preliminary injunction requiring respondents to provide the Court and petitioners' counsel with 30 days' advance notice before any transfer or release of petitioners from Guantanamo Bay, Cuba ("Guantanamo"), filed with court on July 7, 2006.

## ARGUMENT

**I.    PETITIONERS' MOTIONS SHOULD BE DENIED BECAUSE THE DETAINEE TREATMENT VESTS EXCLUSIVE JURISDICTION IN THE D.C. CIRCUIT COURT.**

As an initial matter, both of Petitioners' motions should be denied because the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 ("the Act"), vests exclusive jurisdiction over this action in the D.C. Circuit.  The Act, among other things, amends 28 U.S.C.

§ 2241 to eliminate court jurisdiction to consider *habeas* petitions and other claims by aliens held as enemy combatants at Guantanamo Bay, id., § 1005(e)(1), and creates an exclusive review mechanism in the D.C. Circuit to address the validity of the detention of such aliens and final decisions of any military commissions, id., § 1005(e)(1), (e)(2), (e)(3).  Section 1005(e)(2) of the Act states that the D.C. Circuit "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness of that review.  While the Supreme Court in Hamdan v. Rumsfeld, 548 U.S. —, slip op. at 7-20 (U.S. June 29, 2006), held that § 1005(e)(1) of the Detainee Treatment Act did not apply to *habeas* petitions pending prior to the enactment of the Act, it recognized that the exclusive review provisions of the Act did expressly apply to cases pending prior to enactment.  Although the petitioner in Hamdan escaped the Act because his challenge did not involve a final decision of a military commission within the exclusive jurisdiction of the Court of Appeals under § 1005(e)(3), the Court reserved the question of the effect of the exclusive review provisions of the Act on other cases, stating that "[t]here may be *habeas* cases that were pending in the lower courts at the time the DTA was enacted that do qualify as challenges to 'final decision[s]' within the meaning of subsection (e)(2) or (e)(3).  We express no view about whether the DTA would require transfer of such an action to the District of Columbia Circuit." Hamdan, slip op. at 18, n.14.  The above-captioned case is such a case, i.e., challenging petitioners' designation as an enemy combatant through the Combatant Status Review Tribunal.  Given the Act's investment of exclusive review in the Court of Appeals, the District Court lacks jurisdiction over this case for it is well-settled that an exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more

general grants of jurisdiction, including *habeas corpus*.  Cf., e.g., 5 U.S.C. § 703 ("form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for . . . writs of . . . habeas corpus"); Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); FCC v. ITT World Communications, Inc., 466 U.S. 463, 468 (1984) (Hobbs Act) ("The appropriate procedure for obtaining judicial review of the agency's disposition of these issues was appeal to the Court of Appeals as provided by statute."); Laing v. Ashcroft, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial remedy is available"); Lopez v. Heinauer, 332 F.3d 507, 511 (8th Cir. 2003) ("Because judicial review was available . . . the district court was not authorized to hear this § 2241 habeas petition.").  See also Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 77 (D.C. Cir. 1984) ("even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute") (footnote omitted); id. at 75, 78-79 (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals).  The relief requested by petitioners would require an assertion of jurisdiction and authority in the case inconsistent with the Act's investment of exclusive jurisdiction in the Court of Appeals, and respondents' argument in this regard is in no way immaterial or premature.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) ("Without jurisdiction [a] court cannot proceed at all in any cause."); see also Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514

(1869) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

Thus, the Supreme Court's decision in <u>Hamdan</u> has not resolved the issue of whether this Court may exercise jurisdiction in this case in light of the Act. The effect of the Act was addressed in supplemental briefing in the Guantanamo detainee appeals pending before the D.C. Circuit (<u>Boumediene v. Bush</u>, No. 05-5062, and <u>Al Odah v. United States</u>, No. 05-5064),[1] and respondents have recently requested that the Court of Appeals permit additional briefing on the effect of the <u>Hamdan</u> decision on this issue.[2] Accordingly, while petitioners' request for relief should be denied, at a minimum, a stay of proceedings in this case, including with respect to petitioners' request for relief, is appropriate pending the resolution of the effect of the Act by the Court of Appeals.[3]

## II.    PETITIONERS' FAIL TO SATISFY THE REQUIREMENTS NECESSARY FOR THE ISSUANCE OF A PRESERVATION ORDER.

The weight of authority is that the four requirements for issuance of an injunction – (1) irreparable injury, (2) substantial likelihood of success on the merits with respect to the requested relief, (3) lack of injury to other interested parties, and (4) furtherance of the public interest –

---

[1] Oral argument before the D.C. Circuit was held on March 22, 2006.

[2] Petitioners in the cases involved in the appeals have opposed respondents' request for supplemental briefing.

[3] In addition, a stay of proceedings remains appropriate for the separate and independent reason that the substantive issues in these Guantanamo detainee habeas cases, including whether petitioners have constitutional due process rights and, if so, whether the Combatant Status Review Tribunals satisfy any such rights, remain under consideration by the Court of Appeals. The issues were briefed and argued before the Court of Appeals prior to enactment of the Detainee Treatment Act.

must be satisfied before a preservation order may issue.  See Battayav v. Bush, No. 05-CV-714

(RBW) (dkt no. 12) (denying request for preservation order in Guantanamo Bay Case, holding

"'a motion to preserve evidence is an injunctive remedy and should only issue upon an adequate

showing that equitable relief is warranted'") (quoting Madden v. Wyeth, No. 3-03-CV-0167-R,

2003 WL 21443404, at *1 (N.D. Tex. Apr. 16, 2003)); Pepsi-Cola Bottling Co. of Olean v.

Cargill, Inc., Civ. No. 3-94-784, 1995 WL 783610, at *3-*4 (D. Minn. Oct. 20, 1995); Humble

Oil & Refining Co. v. Harang, 262 F. Supp. 39, 42-43 (E.D. La. 1966).  Other courts have used a

modified, multi-factor analysis for the issuance of preservation orders.  See Capricorn Power Co.

v. Siemens Westinghouse Power, 220 F.R.D. 429, 433-434 (W.D. Pa. 2004) (focusing on "1) the

level of concern the court has for the continuing existence and maintenance of the integrity of the

evidence in question in the absence of an order directing preservation of the evidence; 2) any

irreparable harm likely to result to the party seeking the preservation of evidence absent an order

directing preservation; and 3) the capability of an individual, entity, or party to maintain the

evidence sought to be preserved").  Petitioners have not attempted to meet any of the four

requirements necessary for issuance of a preliminary injunction to justify their need for a

preservation order, therefore, their motion for a protective order should be denied.

Another court, examining the requirements to support a preservation order, created a two-

factor test – an order must be necessary and not unduly burdensome or overbroad.  Pueblo of

Laguna v. United States, 60 Fed. Cl. 133, 137-38 (Fed. Cl. 2004).  However, that test has been

criticized as lacking "adequate precision" and "sufficient depth of analysis."  See Capricorn

Power, 220 F.R.D. at 434 n.2.  While Pueblo of Laguna does not supply the appropriate standard

for entry of a preservation order, even under that test a preservation order is not warranted in this

case. Due to the "very potency" of the inherent power of a court to issue preservation orders and the fact that the Supreme Court has "cautioned 'inherent powers must be exercised with restraint and discretion,'" the Pueblo of Laguna court held that a party seeking a preservation order must demonstrate that the preservation order is both necessary and not unduly burdensome. Pueblo of Laguna 60 Fed. Cl. at 138 (citing Chambers v. NASCO, 501 U.S. 32, 44 (1991)). Petitioners have made neither showing.

First, petitioners have made no showing whatsoever that a preservation order is actually necessary, that is, that absent an order a significant risk exists that evidence at issue will be destroyed. See Pueblo of Laguna 60 Fed. Cl. at 138; Al-Anazi v. Bush, 05-CV-0345 (JDB) (dkt. no. 35) ("The Court is not predisposed to assume that the government would alter or destroy records in its possession absent a court order, and is therefore inclined to require that, at the very least, a party seeking a preservation order against the government make a credible showing of a significant risk of alteration or destruction."). Petitioners' motion is nothing more than a "me-too" filing that is manifestly inadequate to justify the Court's imposition of a preservation order. In any event, a preservation order is unnecessary because the types of documents sought to be protected could relate to pending or developing investigations that the government has initiated into possible misconduct in regard to mistreatment of detainees. Such investigations have served, and will continue to serve, as the basis for prosecutions or other corrective action wherever appropriate.[4] Respondents would not compromise those investigations or prosecutions by destroying or sanctioning the destruction of documents pertinent to such investigations.

---

[4] Examples of such investigations and corrective actions or punishments taken are available at http://www.defenselink.mil/news/detainee_investigations.html; Military to Investigate FBI Prison Abuse Charges, N.Y. Times (Jan. 5, 2005).

Furthermore, the ongoing detention and intelligence-gathering mission of the military at

Guantanamo Bay should dispel any notion that respondents would destroy documents related to

that mission.[5]

     Given that petitioners cannot prove a preservation order is necessary, petitioners' motion

should be denied on that ground alone.  However, even if petitioners could somehow

demonstrate that a preservation order is necessary, they cannot satisfy the second prong of the

Pueblo of Laguna test requiring that a party seeking the preservation order demonstrate that such

an order is not unduly burdensome and that the "particular steps adopted will be effective, but not

overbroad . . . ."  Pueblo of Laguna 60 Fed. Cl. at 138.  The requested preservation order by its

terms suffers from significant overbreadth and may pose substantial burdens and responsibilities

on respondents far exceeding what might otherwise be permissible in traditional discovery.

Petitioners ask the Court to order respondents to preserve, "all evidence, documents and

--------

[5] Preservation of materials related to treatment of the detainees is unnecessary for reasons argued previously in Guantanamo detainee cases in this Court.  Namely, respondents have numerous independent reasons for ensuring the preservation of such documents.  See El-Banna v. Bush, No. 04-CV-1144 (RWR) Resp. Memo. in Opp. to Pets.' Mot. for Leave to Take Discovery and for Preserv. Order, filed January 12, 2005, at pp. 23-24 (dkt no. 111); Al-Marri v. Bush, No. 04-CV-2035 (GK) Resp. Memo. in Opp. to Pets.' Mot. to Take Discovery and for Preserv. Order (dkt no. 14); Battayav v. Bush, No. 05-CV-714 (RBW) Resp. Reply Memo. in Support of Mot. to Stay Proceedings Pending Related Appeals and for Continued Coordination (dkt no. 11).  Further, a preservation order is unnecessary because Judge Kessler has already entered an order to "preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility."  Al-Marri v. Bush, No. 04-CV-2035 (GK), Order (dkt. no. 25) (Mar. 7, 2005).  See also, Al-Anazi v. Bush, 05-CV-0345 (JDB) (dkt. no. 35) (denying as moot petitioners' request for a preservation order because "respondents have a preexisting duty to preserve the very information that this motion addresses [i.e., information related to alleged mistreatment of Guantanamo detainees], pursuant to court orders issued in Al-Marri, No. 04-CV-2035 (D.D.C. Mar. 7, 2005) (order), Anam v. Bush, No. 04-CV- 1194 (D.D.C. June 10, 2005) (order), and Abdah v. Bush, No. 04-CV-1254 (D.D.C. June 10, 2005) (order).").

information, without limitation, now or ever in Respondents' possession, custody or control, regarding the detained Petitioners in this case" <u>See</u> [Draft] Order.  Such an order is overbroad and potentially burdensome to the extent it goes beyond what might otherwise be permissible with respect to any discovery that might ever be appropriate in a habeas case, <u>see</u> <u>Harris v. Nelson</u>, 394 U.S. 296, 300 (1969) (discovery available in habeas cases only in narrow circumstances and upon showing of good cause).  Petitioners' proposal, improperly, and without good cause, would put respondents in the position of having to take action with respect to a wide range of documents without having the opportunity to utilize the process of objection and litigation available in the discovery context to fine tune or challenge discovery requested based on, for example, overbreadth, relevance, or burden.

Thus, petitioners' cannot satisfy either prong of even the <u>Pueblo of Laguna</u> test; <u>a fortiori</u> petitioners cannot demonstrate the four requirements for issuance of an injunction with respect to document preservation.  The motion for preservation order, therefore, should be denied.

## III.  PETITIONERS' ALSO FAIL TO SATISFY THE PRELIMINARY INJUNCTION STANDARDS NECESSARY TO JUSTIFY A COURT ORDER REQUIRING NOTICE OF TRANSFER

### A.  Background

#### 1.     <u>Detention of Enemy Combatants at Guantanamo</u>

Following the terrorist attacks of September 11, 2001, pursuant to his powers as Commander in Chief and with congressional authorization, <u>see</u> Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at Guantanamo.

        2.      <u>Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo</u>

      Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  <u>See</u> Decl. of then Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3 (attached here to as Exhibit A);

Decl. of then Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2

(attached here to as Exhibit B).[6]  The Department of Defense ("DoD") conducts at least annual

reviews of each Guantanamo detainee to determine whether continued detention is warranted

based on factors such as whether the detainee continues to pose a threat to the United States and

its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those annual reviews include those

currently being conducted through Administrative Review Boards.  <u>See</u> Waxman Decl. ¶¶ 3, 7.[7]

As part of the Administrative Review Board process, counsel who represent detainees have been

_____

      [6] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases.  <u>See</u> Waxman Decl. ¶ 1.  The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in <u>Abdah v. Bush</u>, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005).  While Mr. Waxman and Mr. Prosper have both recently left office, the policies and practices set forth in their prior declarations remain in effect and are applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  <u>See</u> <u>infra</u> note 8.

      [7] <u>See</u> <u>generally</u> Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Admin. Review Procedures for Enemy Combatants in the Control of the DoD at Guantanamo Bay Naval Base, Cuba, <u>available at</u> <<http://www.defenselink.mil/news/May2004/d20040518 gtmoreview.pdf>>; Memorandum dated Sept. 14, 2004, re: Implementation of Admin. Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, <u>available at</u> <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government. Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7. Approximately 270 Guantanamo detainees have been so transferred, over a period spanning several years. Waxman Decl. ¶ 4; Prosper Decl. ¶ 2.[8]

Where continued detention by the United States is not warranted, a detainee may be transferred to the control of another government, typically the government of his country of citizenship, for release. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation,

---

[8] As an update to certain information provided in the attached declarations approximately 301 detainees have been transferred by the DoD from Guantanamo, of which approximately 190 were transferred for release. See, e.g., DoD News Releases available at <<http://www.defenselink.mil/news/nrdgb.html>>.

and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. Id. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. Id. In fact, most of the Guantanamo detainees who have been transferred by the DoD to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6-7. It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured. Prosper Decl. ¶ 4; Waxman Decl. ¶ 6. If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed. Waxman Decl. ¶ 6; Prosper Decl. ¶ 5. Once the DoD approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned. Waxman Decl. ¶ 6; Prosper Decl. ¶ 6. Such

discussions include an effort to seek assurances that the United States Government considers

necessary and appropriate for the country in question, including assurances of humane treatment

and treatment in accordance with the international obligations of the foreign government

accepting transfer.  Id.  Among other things, the Department of State considers whether the

nation in question is a party to relevant treaties such as the Convention Against Torture and

Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific

assurances if the nation concerned is not a party or other circumstances warrant.  Id.

      The determination whether it is more likely than not an individual would be tortured by a

receiving foreign government, including, where applicable, evaluation of foreign government

assurances, involves senior level officials and takes into account a number of considerations,

including whether the nation concerned is a party to certain treaties; the expressed commitments

of officials of the foreign government accepting transfer; the particular circumstances of the

transfer, the country, and the individual concerned; and any concerns regarding torture that may

arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are

developed through a process involving the Bureau of Democracy, Human Rights, and Labor

(which drafts the State Department's annual Country Reports on Human Rights Practices) and

the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl.

¶ 7.  When evaluating the adequacy of assurances, State Department officials consider the

identity, position, or other information concerning the official relaying the assurances; political or

legal developments in the foreign country concerned that provide context for the assurances; and

the foreign government's incentives and capacity to fulfill its assurances to the United States.

Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring

mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which

the assurances obtained from the receiving government were not sufficient when balanced

against treatment concerns, the United States would not transfer a detainee to the control of that

government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl.

¶ 8.  Indeed, circumstances have arisen in the past where the DoD decided not to transfer

detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶ 7;

Prosper Decl. ¶ 8.

The United States' ability to seek and obtain assurances from a foreign government

depends on its ability to treat its dealings with the foreign government with discretion.  Prosper

Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of

State's communications with foreign governments concerning allegations relating to torture.

Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained,

because such disclosure would have a chilling effect on and cause damage to our ability to

conduct foreign relations.  Prosper Decl. ¶ 9.  If the United States Government were required to

disclose its communications with a foreign government relating to particular mistreatment or

torture concerns outside appropriate Executive Branch channels, that government and potentially

other governments would likely be reluctant to communicate frankly with the United States

concerning such issues in the future.[9]  Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result,

---

[9] Another reason such disclosure would be harmful is that the State Department's
recommendation concerning transfer relies heavily on facts and analyses provided by Embassies
and other State Department offices, and confidentiality is necessary to ensure that the advice and
analysis provided by those offices are useful and informative for the decision-maker.  Prosper
Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and

disclosure could impede our country's ability to obtain vital cooperation from concerned

governments with respect to military, law enforcement, and intelligence efforts related to the war

on terrorism.  Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

### B.    Preliminary Injunction Standard

As discussed above, it is well-established that a request for preliminary injunctive relief

"is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a

clear showing, carries the burden of persuasion."  See Mazurek v. Armstrong, 520 U.S. 968, 972

(1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a

preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the

merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an

injunction would not substantially injure other interested parties, and 4) that the public interest

would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88

(D.C. Cir. 2001) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746

(D.C. Cir. 1995)).

In particular, the irreparable harm that must be shown to justify a preliminary injunction

"must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against

something merely feared as liable to occur at some indefinite time; the party seeking injunctive

relief must show that the injury complained of is of such imminence that there is a clear and

present need for equitable relief to prevent irreparable harm."  Id. (citations and internal

---

interfere with the ability of our foreign relations personnel to interact effectively with foreign
state officials.  Id.

14

quotation marks omitted; emphasis in original).[10]

### C.    Petitioners Fail to Show Irreparable Injury

The ultimate relief sought by petitioners in this habeas case is obviously release from custody.  Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[11]  "The ultimate objective of a habeas petition is release from custody."  Almurbati v. Bush, 366 F. Supp. 2d 72, 78 (D.D.C. 2005).  As one Judge of this Court stated, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to

_____

[10] Some Judges of this Court have entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  However, as one Judge of this Court has concluded, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay."  Al-Anazi, 370 F. Supp. 2d 188, 199 n.11 (D.D.C. 2005) (citing Laborers' Int'l Union of N. Am. v. Nat'l Post Office Mail Handlers, Civ. A. No. 8801731-OG, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).  Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioners seek might be embodied, petitioners should be required to satisfy the preliminary injunction standard in order to justify that relief.

[11] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the Supreme Court's decision in Rasul v. Bush, 524 U.S. 466 (2004), and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  It has been noted that 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing DoD, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004)); see also supra note 7 (citing documents showing that administrative review process for considering transfers and repatriations predates the filing of this and most other detainee habeas petitions).

maintain jurisdiction."  Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas

petition, including this one, is ultimately about obtaining release from detention, and where, as

here, the United States will relinquish custody of the detainee to the home government there is

nothing more the Court could provide to petitioners.") (citation omitted).

That release from United States custody will give petitioners all the relief they can seek

through habeas is not altered by the fact that, upon being released from the custody of the United

States, a former detainee may be taken into custody and detained in the receiving country based

on that country's independent interests and determinations.  As respondents' declarations make

clear, when the DoD transfers detainees to the control of other governments, the detainees are no

longer subject to the custody or control of the United States, and any subsequent confinement in

the receiving country is based on the receiving government's independent decision, based on its

domestic laws, that the individual should be detained.  Waxman Decl. ¶ 5.  Indeed, even if the

United States transfers a detainee to his home government with the understanding that, from the

United States' perspective, he can be released, the home government may well subsequently take

any law enforcement or investigatory action against the former detainee that it may deem

appropriate under its laws.

D.    **Petitioners Cannot Show a Likelihood of Success in Obtaining a Court Order Preventing a Transfer or Release in Accordance with the Policies Expressed in Respondents' Declarations**

Petitioners fare no better on the second prong of the preliminary injunction analysis,

which requires them to show that they are likely to succeed in preventing a transfer from

Guantanamo.

As two Judges of this Court (who reached opposite outcomes on the bottom line of

16

whether to require advance notice) have agreed, the likelihood of success analysis must focus on

the legal basis for petitioners to obtain an order preventing <u>termination</u> of detention by the United

States in the manner described in the declarations submitted herewith.  See <u>Al-Anazi</u>, 370 F.

Supp. 2d at 194 ("[T]he presence of a sound basis to challenge the legality of one's <u>detention</u>

does not at all imply that there exists a sound basis to challenge the legality of one's <u>transfer</u>.  Put

differently, the 'merits,' if you will, to be assessed for purposes of the present claim for

preliminary injunctive relief, is petitioners' challenge to their <u>transfer</u> from Guantanamo, not to

their <u>detention</u> at Guantanamo) (emphasis in original); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u> there

are no circumstances under which Petitioners could obtain a court order preventing a

contemplated transfer, a preliminary injunction should not be granted") (emphasis in original).

Petitioners fail to identify any valid source of legal authority for such an order.

Moreover, even if a valid source of legal authority existed for an order prohibiting a <u>transfer</u>, the

Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a foreign nation's justice

system and the procedures or treatment that an individual may experience in a foreign nation,

weighs heavily against petitioners' likelihood of success in contesting a transfer or repatriation.

Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an

advance notice requirement to support and facilitate such involvement, the separation of powers

would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy

decisions of the Executive Branch."  <u>People's Mojahedin Org. v. Dep't of State</u>, 182 F.3d 17, 23

(D.C. Cir. 1999) (citing <u>Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.</u>, 333 U.S.

103 (1948)); <u>see also</u> <u>Holmes v. Laird</u>, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such

17

as this, '[t]he controlling considerations are the interacting interests of the United States and of

foreign countries, and in assessing them [the courts] must move with the circumspection

appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our

international relations.'") (quoting Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 383

(1959)).[12]  If the Court were to entertain petitioners' claim to a right to contest repatriation or

removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters.

Judicial review of a transfer or repatriation decision could involve scrutiny of United States

officials' judgments and assessments on the likelihood of torture in a foreign country, including

judgments on the reliability of information and representations or the adequacy of assurances

provided, and confidential communications with the foreign government and/or sources therein.

Prosper Decl. ¶¶ 9-12.  Disclosure and/or judicial review of such matters could chill important

sources of information and interfere with our ability to interact effectively with foreign

governments.  Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8.  In particular, the foreign government

in question, as well as other governments, would likely be reluctant to communicate frankly with

the United States in the future concerning torture and mistreatment concerns.  Prosper Decl. ¶¶

10, 12.  This chilling effect would jeopardize the cooperation of other nations in the war on

terrorism.  Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

---

[12] In Holmes, U.S. citizen servicemembers sued to prevent the United States government from surrendering them to West German authorities to serve sentences for convictions by West German courts on criminal charges relating to their conduct while stationed in West Germany. Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the plaintiffs' invitation to examine the fairness of their treatment by the West German courts and declined to enjoin the transfer, the latter court holding that "the contemplated surrender of appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459 F.2d at 1225.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)); see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the extradition context" "counsel[s] even further against judicial interference"). This principle is sometimes called the Rule of Non-Inquiry. For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack. While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper. "The interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." Id. at 1067. "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch") (internal quotation marks omitted); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61

(E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry), on appeal, No. 05-3149 (3d Cir.). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioners seek judicial review of any kind of transfer, repatriation or removal from Guantanamo, rather than merely trying to block an extradition. The considerations that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[13] See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as institutions and

---

[13] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993). However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision. See Kin-Hong, 110 F.3d at 111 n.12. In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance. See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers. It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioners may contend that the only possible way to repatriate them would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit. See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, Civ. A. No. 93-1465, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen). Thus, petitioners cannot turn to the courts to second-guess Executive judgments about matters such as custodial conditions and/or the adequacy of legal procedures in a foreign country, as well as the credibility and adequacy of a foreign government's assurances. Cf. People's Mojahedin, 182 F.3d at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry'") (quoting Chicago & S. Air Lines, 333 U.S. at 111)).

***

Thus, there is no basis in law for an injunction requiring that petitioners' counsel and this Court be given advance notice of any upcoming transfer or release. Neither the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of ordering custody that the United States wishes to relinquish to nevertheless be artificially and indeterminately prolonged purely to preserve a live case for the Court. And, apart from the absence of affirmative legal authority, separation of powers considerations and foreign relations sensitivities preclude a judicial inquiry in which this Court would substitute its judgment regarding the appropriateness of repatriation for that of the appropriate Executive Branch officials.

**E.    An Injunction Requiring Advance Notice Would Trample on the Separation of Powers**.

It is undisputed that the sole reason petitioners seek advance notice is to enable them to seek an order blocking a transfer or repatriation decision that the Executive would already have made after consultation and coordination with the foreign government in question. Such an advance notice requirement foreshadows judicial review and intervention that would be accompanied by the attendant harms discussed in the declarations of then Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith. See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. See supra Section D (describing interests that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). An advance notice requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers. These harms weigh heavily

22

against entry of a preliminary injunction.

### F.    An Injunction Would Disserve the Public Interest.

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion within its constitutional sphere of responsibility.[14]  As one Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon the foreign policy and war powers of the Executive on a deficient factual record. Where the conduct of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the judicial function for a court to review foreign policy decisions of the Executive Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.

---

[14] While two Judges, in granting preliminary injunctions, have relied on the general statement that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994), cited in Al-Joudi v. Bush, Civ. A. No. 05-0301 (GK), 2005 WL 774847, at *6 (D.D.C. Apr. 4, 2005); Abdah, 2005 WL 711814, at *6, that formulation leaves the question what violations of constitutional rights (assuming arguendo that enemy aliens detained at Guantanamo possess rights under the United States Constitution, but see Khalid, 355 F. Supp. 2d 311, 320-23 (D.D.C. 2005), are present or imminent here and stand to be prevented by an injunction.  As discussed above, respondents' policy and practices governing transfer and repatriation of Guantanamo detainees plainly do not violate any rights petitioners may have, constitutional or otherwise.  The public interest surely does not support assuming without any foundation that Executive Branch officials are wont to engage in constitutional violations unless supervised by the courts.

## CONCLUSION

For the reasons stated, respondents respectfully request that petitioners' motion for preservation order and motion for preliminary injunction requiring respondents to provide the Court and petitioners' counsel with 30 days' advance notice before any transfer or release of petitioners from Guantanamo Bay, Cuba should be denied.

Dated:  July 17, 2006                    Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

   /s/ James J. Schwartz
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ (D.C. Bar No. 468625)
PREEYA M. NORONHA
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 7310
Washington, DC  20530
Tel:  (202) 616-8267
Fax:  (202) 616-8202

Attorneys for Respondents