IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALIM SAID, *et al.*, )<br>)<br>Petitioners, )<br>)<br>v.   )<br>)<br>GEORGE W. BUSH, )<br>President of the United States, )<br>*et al.*, )<br>)<br>Respondents. )<br>) | Civil Action No. 05-CV-2384 (RWR) (AK) |

**RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR
ORDER DIRECTING RESPONDENTS TO COMPLY WITH PROTECTIVE
<u>ORDER WITH RESPECT TO ATTORNEY-CLIENT MATERIALS</u>**

Respondents hereby oppose petitioners' motion for an order directing respondents to comply with protective order with respect to attorney-client materials (dkt. no. 39).

Petitioners' motion raises several complaints regarding counsel access to the petitioners in this case – none of which has an appropriate legal or factual basis. First, petitioners' counsel complain that guards at Guantanamo Bay violated the protective order in this case when they searched and seized material from counsel prior to a meeting with petitioners on June 8, 2006. This claim is without merit. Guards conducted a routine search of petitioners' counsel prior to entry into a restricted area of Guantanamo and discovered prohibited contraband. In light of that discovery, the guards conducted a further search, which led to a dispute between counsel and the guards regarding certain documents that counsel intended to bring into their meetings with petitioners. Based on counsel's own description of the materials, however, Guantanamo authorities determined that the materials were not appropriate for release to the petitioners under the governing counsel access regime. Out of an abundance of caution regarding any potential

claim of privilege by counsel, the materials were then sent to the Court Security Officers without any further review or examination.  Thus, contrary to the claims in petitioners' motion, Guantanamo authorities acted reasonably, consistent with the protective order regime, and did not compromise the attorney-client privilege during this incident.

Second, petitioners' motion requests that the Court compel respondents to deliver legal mail to two petitioners in the case – Bandar Al-Jaabir and Saad Al-Qahtani.  As a threshold matter, these two petitioners are currently approved to receive – and have received – legal mail from counsel in accordance with the terms of the protective order; thus, petitioners' motion is now moot in this regard.  In any event, petitioners' complaints that certain legal mail was not delivered while the issue of whether counsel could even have access to petitioners through legal mail channels was still unresolved, are without an appropriate legal basis.  Petitioners were not authorized to receive privileged mail under the terms of the protective order prior to resolution of respondents' objections to counsel access based on the defective standing of the putative next friend petitioners in this case.

Third, petitioners' allege that petitioner Al-Qahtani has not received any mail from his family or otherwise since 2003.  This claim is without merit.  In addition to the legal mail that petitioner Al-Qahtani received in June and July of this year, non-legal mail to Al-Qahtani was delivered to him in October 2003 and August 2005.  Moreover, petitioners' request for a judicial order governing the timing and procedures for delivery of non-privileged mail to petitioners lacks legal support and is unnecessary in light of procedures already in place at Guantanamo for detainees to communicate with persons other than their counsel.

For these reasons, as explained more fully below, petitioners' motion should be denied.

## **BACKGROUND**

### I.     **The Protective Order and Counsel Access Procedures**

On November 8, 2004, Senior Judge Joyce Hens Green, in the context of the then-pending and coordinated Guantanamo Bay detainee habeas cases, entered an Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba ("Protective Order"), followed shortly thereafter by certain supplementary orders clarifying and detailing certain matters involved the Protective Order. See In re Guantanamo Detainee Cases, 344 F. Supp. 2d 174 (D.D.C. Nov. 8, 2004); Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order in In re Guantanamo Detainee Cases, No. 02-CV-0299, et al. (D.D.C. Dec. 13, 2004); Order Addressing Designation Procedures for "Protected Information" in In re Guantanamo Detainee Cases, No. 02-CV-0299, et al. (D.D.C. Nov. 10, 2004). The Protective Order was entered by Judge Green after the parties had engaged in lengthy negotiations, after certain issues had been litigated, and after Judge Green considered a proposed protective order and counsel access procedures and made her own revisions to them. The Court entered the same orders, combined into one Protective Order, in this case on April 12, 2006. See Protective Order (dkt. no. 15).

The Protective Order was crafted in recognition of the unique circumstances of the Guantanamo habeas cases, which involve aliens detained as enemy combatants in an overseas military detention facility during wartime. The detention of such enemy combatants in a military operational setting such as Guantanamo creates pragmatic issues unparalleled in routine litigation. The Protective Order, inter alia, establishes a regime for the protection, handling, and

control of classified and otherwise protected information that may be involved in the case. The Revised Procedures for Counsel Access to Detainees at the U.S. Naval Base in Guantanamo Bay, Cuba, ("Access Procedures"), which are annexed to the Protective Order as Exhibit A, in turn set certain terms, conditions, and limitations for habeas counsel's access to properly represented detainees, including procedures and requirements with respect to information and papers delivered by counsel to detainees, as well as obtained by counsel from detainees, "for purposes of litigating the cases in which this Order is issued." See Access Procedures § I. For example, in recognition of the unique, wartime setting of these cases and detentions, including that information possessed by detainees could have national security or base and personnel security implications warranting potential treatment of the information as classified, the Access Procedures require that counsel and interpreters involved with detainees obtain security clearances and that information learned from detainees be treated as classified pending review by a Privilege Team. See Access Procedures §§ III.A., IV.A.6., VI., VII.

In addition, consistent with recognition of the realities of detention in a military setting, the Access Procedures set terms and conditions on privileged counsel visits and permit privileged "legal mail" between counsel and a represented petitioner, but subject to various requirements and restrictions. See Access Procedures § III (listing various requirements that must be established "[p]rior to being permitted" access to and communications with detainees). Because all communications to and from the wartime detainees at Guantanamo such as petitioners are normally and appropriately subject to security and intelligence screening by the military, the special, privileged legal communications channels created under the Access Procedures are available only for "legal mail" sent solely "for purposes of litigating the cases in

which th[e] Order is issued." Access Procedures §§ I, II.E. Privileged "legal mail" is, by definition, limited to:

> Letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged documents and publicly filed legal documents relating to that representation.

Id. § II.E.

With respect to in-person meetings between counsel and detainees at Guantanamo, the Access Procedures provide that counsel "shall bring only legal mail, writing utensils and paper into any meeting with a detainee unless counsel has received prior approval from the Commander, JTF-GTMO." Id. § V.A. Further, the Access Procedures mandate that all "[w]ritten and oral" communications with detainees during these meetings, "including all documents brought into a meeting with a detainee," must not include

> information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.

Id. § V.B; see also id. § IV.A.7 (same restriction applies to legal mail sent by counsel to detainees). This prohibition was instituted because permitting such information to be introduced into the detainee population at Guantanamo, inter alia, could threaten security by causing unrest or disruption among the enemy combatant detainees, who have a motivation and purpose to resist their confinement and cause harm or death to the United States personnel who presently confine them. See, e.g., John Solomon, Gitmo Guards Often Attacked by Detainees, at http://www.washingtonpost.com/wp-dyn/content/article/2006/07/31/AR2006073100576.html

(describing attacks by detainees using broken toilet parts, utensils, radios, and "cocktails" of feces, urine, vomit and sperm collected in meal cups); Kathleen T. Rhem, Skirmish With Guards, Two Suicide Attempts Test Guantanamo Procedures, at http://www.defenselink.mil/news/May2006/20060519_5177.html (describing incident on May 18, 2006, in which two detainees overdosed on medications that they had illicitly hoarded during medical treatment and a separate incident on that same day in which detainees ambushed and attacked guards using weapons fashioned from fans and other materials); Carol J. Williams, Commander: Suicide Plots Continuing, Miami Herald, June 28, 2006, at 7A, at http://www.miami.com/mld/miamiherald/news/nation/14920247.htm (recent searches of detainees' cells at Guantanamo have uncovered hoarding of medicines, including in detainees' waistbands and even in a detainee's prosthetic limb)

     In recognition of security and force-protection concerns such as these, the Access Procedures include a series of security procedures governing counsel's access to detainees during their visits to Guantanamo Bay. Id. § X. Prior to conducting interviews with detainees, security personnel at Guantanamo have the authority to "perform a contraband inspection of counsel and translators/interpreters using metal detectors as well as a physical inspection of counsel's bags and briefcases and, if determined necessary, a physical inspection of his/her person." Id. § X.D; see also id. § X.G (counsel may be inspected and searched at conclusion of meeting with detainee). The purpose of these searches is to preclude prohibited forms of contraband from entering the detainee population. See id. § X.B ("Contraband is not permitted in JTF-Guantanamo"). In deference to the military authorities charged with maintaining security at Guantanamo and in recognition of the various forms of contraband, the Access Procedures do

not define the term "contraband" in specific terms. Instead, the Access Procedures provide an illustrative list of materials that counsel are prohibited from bringing to detainees, absent approval from Guantanamo. Id. ("Examples of contraband include, but are not limited to, weapons, chemicals, drugs, and materials that may be used in an escape attempt. Contraband also includes money, stamps, cigarettes, writing instruments, etc.").

The Protective Order provides that petitioners' counsel are bound by the terms, conditions, and limitations contained in the Access Procedures on counsel's access to and interaction with detainees and the handling of mail and other materials in such interaction. See Protective Order ¶ 6, 344 F. Supp. 2d at 176. Further, the Access Procedures themselves provide that in order to be permitted access to represented detainees, petitioners' counsel, inter alia, must "agree to comply fully" with the procedures and provide a written affirmation to that effect. Access Procedures § III.B.1. Moreover, consistent with the unique nature of these cases and the detentions, the Access Procedures specifically provide that "[s]hould counsel fail to comply with the procedures set forth in this document [i.e., the Access Procedures], access to or communication with the detainee will not be permitted." Id. § III.B.4.

**II.      Petitioners' Counsel's June 2006 Visit To Guantanamo Bay.**

Petitioners' counsel visited Guantanamo Bay from June 5-11, 2006, to conduct their initial meetings with the five petitioners in this case.[1] This visit occurred just two weeks after an

---

[1] Petitioners' counsel conducted interviews with four petitioners from June 6-9, 2006. Although counsel had meetings scheduled with petitioners on June 10, interviews were cancelled that day due to the tragic suicides of three detainees that occurred the night before. See, e.g., Sara Wood, Three Guantanamo Bay Detainees Die of Apparent Suicide, at http://www.defenselink.mil/news/Jun2006/20060610_5379.html. Consequently, petitioners' counsel were unable to conduct interviews with petitioner Mohammed Zahrani during their visit. However, counsel were scheduled to meet with petitioner Zahrani, among

incident in which a number of detainees ambushed and attacked guards using weapons fashioned from fans and other housing materials. See supra at 5-6. On June 8, 2006, petitioners' counsel were transported to an area of Guantanamo Bay known as "Camp Echo," where privileged meetings between attorneys and detainees take place. Consistent with Guantanamo's standard operating procedures and the Access Procedures, petitioners counsel, including their bags and briefcases, were searched by Guantanamo authorities for contraband prior to conducting meetings with petitioners. See Declaration of Commander Patrick McCarthy ¶¶ 3-5 (attached hereto as Exhibit A) ("McCarthy Decl."). During the course of the search, the guards discovered various news articles regarding the detentions at Guantanamo in the briefcase of one attorney, Jeff Colman. Id. ¶¶ 3-4; see Petitioner's Motion, Declaration of Patricia A. Bronte ¶ 4 ("Bronte Decl.") (Exhibit A). Mr. Colman informed the guards that he mistakenly failed to remove the articles from his briefcase prior to entry into Camp Echo and agreed not to bring the articles into his meetings with petitioners. See McCarthy Decl. ¶ 5; Bronte Decl. ¶ 4. In light of the discovery of prohibited contraband, however, the guard staff proceeded to conduct a thorough inspection of the remaining attorneys and interpreters in the group to make certain that no contraband would be introduced to the detainee population and to ensure compliance with the Access Procedures and Guantanamo's security procedures. See McCarthy Decl. ¶ 5. During the course of this search, guards discovered additional written materials that appeared to be contraband, that is, materials not otherwise appropriate for distribution to petitioners under the terms of the Access Procedures. See McCarthy Decl. ¶¶ 3, 5. The guard staff advised the Guantanamo Staff Judge Advocate ("SJA") of the discovery, and when asked about the content

---

other detainees, during another visit to Guantanamo on July 30-August 2, 2006.

of materials by the SJA, petitioners' counsel explained that the materials were summaries of other Guantanamo habeas cases prepared by the Center for Constitutional Rights. Id. ¶ 3. Based on this description of the materials, the SJA informed petitioners' counsel that the materials would not be permitted into their meetings with petitioners because the materials were not directly related to petitioners' case, as required by the terms of the Access Procedures. Id. ¶¶ 3, 5.

While counsel conducted their meetings with petitioners, the disputed materials were held temporarily by the guard staff in Camp Echo. Id. ¶ 3. Shortly thereafter, the materials were delivered to a staff member of Guantanamo's Staff Judge Advocate's Office under a cover sheet. Id. Subsequently, the materials were placed into an envelope, sealed, and transported to Washington, D.C. for delivery to the Court Security Officers designated in the Protective Order, see Protective Order ¶ 16, without further discussion, disclosure, or examination of the contents of those materials.[2] See McCarthy Decl. ¶ 3.

**ARGUMENT**

1.   **Guantanamo Authorities Acted Consistent With The Access Procedures When Searching Counsel For Contraband During Counsel's June 2006 Visit.**

Petitioners' motion seeks an extraordinarily broad order limiting the authority of Guantanamo personnel to search petitioners' counsel and their belongings prior to conducting in-person meetings with detainees at Guantanamo. See Petitioners' Motion, Draft Order. Because such an order is not legally or factually warranted, petitioners' request for relief should be

---

[2] It is undersigned counsel's understanding that the Court Security Officers received the materials and subsequently delivered them to the security work facility provided for petitioners' counsel under the Protective Order.

denied.

The focus of petitioners' motion is an incident that occurred at Guantanamo on June 8, 2006, when Guantanamo authorities searched and seized prohibited contraband from petitioners' counsel.  Contrary to the assertions in petitioners' motion, Guantanamo authorities acted reasonably and consistent with the Access Procedures at all times during this incident.  As a threshold matter, petitioners' motion does not – and cannot – challenge Guantanamo's authority to search visiting attorneys for contraband prior to conducting meetings with detainees.  This authority is clearly provided by the Access Procedures, consistent with the general right and responsibility of military officials charged with the safe and secure detention of enemy combatants during a time of war to undertake appropriate security measures.  See Access Procedures § X.D (security personnel at Guantanamo have the authority to "perform a contraband inspection of counsel and translators/interpreters using metal detectors as well as a physical inspection of counsel's bags and briefcases and, if determined necessary, a physical inspection of his/her person"); Cafeteria & Rest. Workers Union, Local 473 v. McElroy, 367 U.S. 886, 890 (1961) (commanders of military installations have prerogative and responsibility, grounded in history and the constitutional authority of the Executive, to control access to their command area for purposes of good order and security); cf. Spear v. Sowders, 71 F.3d 626, 630 (6th Cir. 1995) (en banc) (prison officials have "great[] leeway" to conduct searches of visitors).

Petitioners' counsel nonetheless object to the specific manner in which Guantanamo authorities conducted the search on June 8, 2006, arguing that Guantanamo's authority to search visiting counsel is limited only to physical contraband, such as weapons, drugs, and similar

items.  See Petitioners' Motion at 4 & Draft Order.  The Access Procedures, however, are not so limited with respect to the types of contraband that counsel are prohibited from bringing into interviews with detainees.  To be sure, while the Access Procedures prohibit physical contraband, see Access Procedures § X, the Access Procedures also prohibit various types of non-privileged written contraband from being brought into meetings with detainees.  Such prohibited written materials include messages to the detainee from persons other than counsel, see § V.A., as well as documents containing information "relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation."  See §V.B.  Given the prohibition in the Access Procedures with respect to both physical and written materials, Guantanamo personnel have the authority to seize such contraband pursuant to their authority to perform contraband inspections of counsel prior to meetings with detainees.[3]  See Access Procedures § X.

With respect to the specific incident at issue in this case, Guantanamo authorities acted reasonably and consistent with the Access Procedures during their search of petitioners' counsel.

---

[3] Remarkably, petitioners' motion contends that "nothing in the Protective Order suggests that JTF guards may employ self-help and confiscate the allegedly improper materials."  See Petitioners' Motion at 5.  Not only does this argument conflict directly with section X of the Access Procedures, which authorize contraband inspections of counsel, but it ignores the basic fact that the entire purpose of a contraband inspection is to prevent contraband from entering a restricted area.  Thus, the authority to perform a contraband inspection necessarily includes the authority to seize contraband.

As an initial matter, the context in which the search occurred must be considered. Just over two weeks before counsel's visit, Guantanamo had experienced a melee in one of the detention camps in which detainees had ambushed and attacked guards with hand-fashioned weapons. See supra at 5-6. Accordingly, concerns regarding camp security would have been heightened during the time of counsel's visit. Furthermore, as described above, upon conducting their routine search of petitioners' counsel, the guard staff discovered in counsel's materials various Internet news articles that were not appropriate for delivery to the detainees. See McCarthy Decl. ¶¶ 3, 5. Notably, petitioners did not, and do not, challenge this aspect of the search; in fact, counsel essentially conceded at the time that the materials were contraband that an attorney inadvertently failed to remove from his brief case prior to meeting with the detainees. See Bronte Decl. ¶ 4. Based on this initial discovery of contraband in counsel's possession, however innocent, the guard force sensibly, especially in light of the then-recent disturbances at the base, proceeded to conduct a thorough search of the remaining materials that the counsel group was attempting to bring into their meetings with the detainees. See McCarthy Decl. ¶ 5. That search ultimately led to the discovery of additional materials that appeared to be written contraband prohibited by the Access Procedures. Id. ¶¶ 3,5. When asked about the materials, petitioners' counsel volunteered that the materials were summaries of other Guantanamo habeas cases prepared by the Center for Constitutional Rights. Id. ¶ 3. Based on that description of the materials, Guantanamo authorities determined that the materials were not appropriate for delivery to the detainees.[4]  Id.

---

[4] Petitioners' motion also complains about the length of the search, claiming that it lasted at least 45 minutes. See Bronte Decl. ¶ 3. While respondents dispute that claim, see McCarthy Decl. ¶ 5, the time required to screen incoming visitors for counsel meetings with detainees

Petitioners' motion, thus, essentially boils down to a complaint regarding whether counsel may bring a specific document into a meeting with petitioners under the terms of the Access Procedures. Despite the limited nature of the dispute at issue, petitioners nonetheless seek sweeping relief in the form of a judicial order limiting Guantanamo's ability to conduct contraband searches of counsel prior to meeting with detainees. See Petitioners' Motion, Draft Order. In petitioners' view, the inspecting guard force must willfully shut its eyes to any written material in counsel's possession as they conduct contraband inspections. There is simply no basis for such an order. As explained above, the Access Procedures permit the Guantanamo guard force to search counsel for prohibited written and physical contraband. Indeed, the relief petitioners seek would improperly prevent the guard force from intercepting items such as the Internet news articles that counsel admit were not appropriate for delivery to detainees. Accordingly, the Court should reject petitioners broad request for relief in this matter.[5]

---

necessarily depends upon various factors, such as the number of visiting counsel and the amount of material counsel want to bring into their meetings. Id. Needless to say, additional time may be required in the event contraband is discovered, as was the case here, and when disputes arise between counsel and guard personnel regarding the propriety of certain materials.

[5] One apparent, and faulty premise for petitioners' request for exceedingly broad relief is that the attorney-client privilege has been violated. No such violation of privilege occurred in this case. Once the guards identified the material as contraband, the ultimate decision by Guantanamo to seize the documents at issue was based on counsel's own voluntary description of their content. See McCarthy Decl. ¶¶ 3, 5; see also United State v. American Tel. and Tel. Co., 642 F.2d 1285, 1299 (D.C. Cir. 1980) (any voluntary disclosure to a third party of purportedly privileged communications is waiver of privilege). Immediately following the seizure, in order to avoid compromising any potential claim of attorney-client privilege, the materials were sealed and returned to the Court Security Office without further discussion, disclosure, or examination of their contents. See McCarthy Decl. ¶ 3. While petitioners' motion alleges that guards contacted unidentified persons by radio to discuss the content of seized documents, in fact, the guards were attempting to contact the Guantanamo Staff Judge Advocate's office to seek guidance regarding the materials. Id. ¶ 3. In any event, as it turns out, the SJA came upon the scene while the guard staff was attempting to contact his office. Id. And

In the event petitioners' counsel want to contest Guantanamo's decision to prevent specific materials from being brought by counsel into a meeting with a detainee, the proper course of action, not followed here, is for counsel to place the documents at issue before the Court and request narrowly-tailored relief, such as an order that counsel may bring a specific document into a meeting with a petitioner, consistent with the terms of the Access Procedures. Counsel have not done that here, however. They have not made any showing, either in their motion or even to the Guantanamo SJA at the time the dispute in this matter arose, regarding how any specific material is not contraband and is "directly related" to representation of a specific petitioner. See Access Procedures § V.B. The Court should not entertain petitioners' request for broad relief limiting Guantanamo's ability to conduct contraband searches genreally, particularly when such an order would have the anomalous result of permitting counsel to enter future detainee meetings at Guantanamo with the precisely the type of material Guantanamo deemed contraband and that is contested in the present motion.

For the reasons stated above, Guantanamo authorities acted reasonably and consistent with the Access Procedures at all times during their search and seizure of the contraband materials in counsel's possession on June 8, 2006. Consequently, petitioners' request for relief should be denied.

2.  **Petitioners Al-Jaabir And Al-Qahtani Have Received Legal Mail In Accordance With The Protective Order And Access Procedures.**

Petitioners' motion also incorrectly contends that respondents violated the Access

---

the decision not to permit the materials into the detainee meetings was made by the SJA based on counsel's description of the materials. Id. Such contact between Guantanamo guard force personnel and lawyers in the Staff Judge Advocate's office is routine procedure, particularly when the guard force is confronted with a potential legal dispute with visiting counsel. Id.

Procedures by refusing to deliver legal mail to petitioners Bandar Al-Jaabir and Saad Al-Qahtani. This argument is without merit. Petitioners' argument is predicated on the mistaken conclusion that entry of the Protective Order and Access Procedures automatically obligated respondents to deliver legal mail to petitioners. See Petitioners' Motion at 5. Petitioners, however, ignore that the issue of counsel's privileged access to petitioners, through visits and legal mail, was the subject of ongoing disagreement and litigation between the parties, which was not resolved until well after counsel sent, and Guantanamo received, the legal mail items about which petitioners complain. Since resolution of the issue in petitioners' favor, however, Guantanamo has assiduously delivered to petitioners legal mail sent by petitioners' counsel. Petitioners' request for relief as to this matter, therefore, is moot.

Entry of the Protective Order and Access Procedures in a Guantanamo habeas case is only one of several prerequisites that must be established before counsel are permitted privileged mail and visits with detainees at Guantanamo. Indeed, the Access Procedures, by their very terms, list various requirements that must be established "[p]rior to being permitted" privileged access to and communications with Guantanamo detainees. See Access Procedures § III.C.1. Among other things,[6] the Access Procedures provide that "[p]rior to being permitted access to the detainee," counsel must "provide evidence of his or her authority to represent the detainee."

---

[6] Additional paragraphs in section III of the Access Procedures require counsel to submit a certification regarding the source of funding for counsel in the representation, id. § III.C.4, as well as acknowledge compliance with the Protective Order and Access Procedures "[b]efore bring granted access to the detainee." Id. § III.B.1; see also Protective Order ¶¶ 18 & 36, Exhibits B & C (requiring counsel to file a Memorandum of Understanding acknowledging the protective order with the Court and submit copies to the Court Security Officers and government counsel, and execute an Acknowledgment for access to protected information).

Id. In other Guantanamo detainee cases, this evidence has typically taken the form of letters from detainees directly authorizing a challenge to their detention, or affidavits and authorizations of "next friends" who have filed petitions on behalf of detainees.

Although the Court entered the Protective Order in this case on April 12, 2006, counsel at that time had not satisfied the Access Procedures' requirements for counsel access to petitioners Al-Jaabir and Al-Qahtani based on the failure of counsel to obtain and submit next friend authorizations that satisfied the standing requirements established in Whitmore v. Arkansas, 495 U.S. 149 (199). Contrary to the claims in petitioners' motion, see Petitioners Motion at 5, respondents' counsel informed petitioners' counsel by e-mail on May 10, 2006, that respondents would not permit counsel access to petitioners Al-Jaabir and Al-Qahtani because the petition brought on their behalf was not directly authorized by the petitioners, nor had the putative "next friend" detainees established appropriate next friend standing under Whitmore. See Exhibit B e-mail from Andrew Warden to Jeff Colman (attached hereto as Exhibit B). Thus, contrary to petitioners' counsel's assertions, petitioners' counsel were, indeed, notified by respondents that counsel access would not be permitted with petitioners Al-Jaabir and Al-Qahtani based on respondents' position regarding the purported next-friend authorization.

Petitioners' objected to respondents' interpretation of the Access Procedures and filed a motion before this Court seeking counsel access to petitioners Al-Jaabir and Al-Qahtani. See Emergency Motion For Order Directing Respondents To Comply With Protective Order And To Facilitate Attorney Meetings With Petitioners (dkt. no. 19). Magistrate Judge Kay granted the motion on May 23, 2005. See Memorandum Order (dkt. no. 24). Consequently, the issue of counsel's entitlement to send legal mail to petitioners at Guantanamo was not resolved until this

date, at the earliest.[7]

Despite the dispute between the parties over whether access by counsel to petitioners Al-Jaabir and Al-Qahtani was required and appropriate under the Access Procedures, petitioners' counsel nonetheless attempted to send legal mail to petitioners at Guantanamo. Legal mail addressed to petitioners Al-Jaabir and Al-Qahtani arrived at Guantanamo on May 17, 2006 but the letters were returned to the Court Security Officers because counsel were not permitted to provide legal mail to petitioners at that time in light of the ongoing dispute over the access issue. See Petitioners' Motion, Exhibit C. Subsequent to the Court's resolution of access issue, however, legal mail from counsel to petitioners Al-Jaabir and Al-Qahtani received by Guantanamo as been delivered under the terms of the Access Procedures. See McCarthy Decl. ¶ 6. Indeed, petitioners received multiple pieces of legal mail on June 23, July 10, and July 18, 2006. Id.

Accordingly, petitioners' motion for relief concerning legal mail is ill-founded and, in any event, is now moot.

### 3. Petitioner Al-Qahtani Has Received Non-Legal Mail During His Detention At Guantanamo.

Petitioners' motion also complains that petitioner Al-Qahtani has not received mail of any kind at Guantanamo since August 2004, even though his family allegedly sent him letters. This allegation is not true. In addition to the legal mail that petitioner Al-Qahtani received in June and July of this year, Guantanamo mail records show that he received non-legal mail in

---

[7] Respondents sought reconsideration of the Magistrate Judge's order, which was denied by the Court on May 26, 2006.

October 2003 and August 2005, and such mail was delivered to him at that time. See McCarthy Decl. ¶ 7.

In any event, petitioners' request for a Court order compelling respondents to deliver non-legal mail to petitioners "promptly" and "in accordance with customary international law" is not factually or legally warranted. See Petitioners' Motion, Draft Order. As explained in the attached Declaration of Wade M. Brown, Guantanamo has procedures in place to facilitate timely delivery of non-legal mail communications between detainees and persons other than counsel through the mail system administered by the Department of Defense and through the International Committee for the Red Cross ("ICRC"). See Declaration of Wade M. Brown (attached hereto as Exhibit C) ("Brown Decl."), originally filed in John Does 1-570 v. Bush, 05-CV-313 (CKK). These systems were developed and operational prior to and independent of the Protective Order and Access Procedures in this litigation. See id.; see also, e.g., Coalition of Clergy, Lawyers, and Professors v. Bush, 310 F.3d 1153, 1160 (9th Cir. 2002) (noting, pre-Rasul v. Bush, that Guantanamo detainees were able to send and receive mail and were permitted to communicate outside Guantanamo through the International Committee of the Red Cross). Guantanamo provides each detainee with stationery, envelopes and a pen so that they may write letters and postcards to family and friends which are stamped and mailed by Guantanamo on behalf of the detainees. See Brown Decl. ¶ 5. Guantanamo also processes and delivers mail that is sent to detainees from private individuals outside Guantanamo Bay.[8] See id. In addition, it is

---

[8] Given that Guantanamo Bay is an overseas military base operating during a time of war, respondents acknowledge that mail may take some time to be transmitted to and from Guantanamo Bay through the postal services of foreign governments and the United States Postal Service (which is beyond the control of the Department of Defense), however, the processing by the Department of Defense of incoming and outgoing detainee mail at

standard practice for delegates from the ICRC periodically to visit detainees at Guantanamo and to send and deliver mail on the detainees' behalf. See id. ¶ 6. Moreover, a detainee's mail privileges cannot be removed for any reason, including disciplinary or interrogation purposes. See id., ¶ 2. In light of these mail procedures, which remain in effect, there is no factual basis for the relief that petitioners' seek in their motion.

Further, no legal basis exists for a judicial order governing procedures for delivery of non-legal mail to detainees at Guantanamo. The Protective Order and Access Procedures do not place any enforceable restrictions on the processing of non-legal mail and, indeed, defer to military authorities regarding delivery of non-legal mail. See Access Procedures § IV.A.5; IV.B.4 (stating that detainees may send and receive non-legal mail from persons other than counsel and that such communications shall be reviewed by military personnel under standard operating procedures). Additionally, the legal authorities cited by petitioners do not support judicially enforceable relief. See Petitioners' Motion at 3 n.2. Petitioners' cite an opinion from the Inter-American Court of Human Rights, but decisions of this court do not create judicially enforceable rights. See Garza v. Lappin, 253 F.3d 918, 924-26 (7th Cir. 2001) (stating that United States has not ratified the American Convention on Human Rights, which creates the Inter-American Court of Human Rights to enforce provisions of the Convention); see also Buell v. Mitchell, 274 F.3d 337, 372 (6th Cir. 2001) (American Convention on Human Rights not judicially enforceable). Similarly, petitioners' reliance on a resolution from the United Nations Commission on Human Rights is inapposite because such resolutions are not judicially enforceable. See Diggs v. Richardson, 555 F.2d 848, 850-51 (D.C. Cir. 1976) (holding that

---

Guantanamo Bay has consistently taken two weeks, on average. See Brown Decl. ¶ 5.

United Nations resolution does not confer rights that are judicially enforceable). In any event, to the extent petitioners' authorities are even relevant to the present wartime content, both refer to issue of "incommunicado detention," which as explained above, is not at issue in this case.

## **CONCLUSION**

For the reasons stated above, petitioners' motion for order directing respondents to comply with protective order with respect to attorney-client materials should be denied.

Dated: August 3, 2006              Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

   /s/ Andrew I. Warden
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
PREEYA M. NORONHA
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN (IN Bar No. 23840-49)
EDWARD H. WHITE
MARC A. PEREZ
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.  Room 7144
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents