REDACTED -- UNCLASSIFIED

APPROVED FOR PUBLIC FILING

JANUARY 25, 2007

FILED WITH THE
COURT SECURITY OFFICER
CSO: [illegible]
DATE: [illegible]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SALIM SAID, *et al.*, | ) | |
| Petitioners, | ) | |
| v. | ) | No. 1:05 CV 2384 (RWR) |
| GEORGE W. BUSH, *et al.*, | ) | |
| Respondents. | ) | |

**MEMORANDUM IN SUPPORT OF PETITIONER AL QAHTANI'S MOTION TO PRESERVE REMAINING EXCULPATORY EVIDENCE**

Dated: January 7, 2008

Patricia A. Bronte
Sapna G. Lalmalani
JENNER & BLOCK LLP
330 North Wabash Ave.
Chicago, IL 60611
Tel: (312) 923-8357
Fax: (312) 840-7757

David W. DeBruin (DDC Bar No. 337626)
JENNER & BLOCK LLP
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005-3823
Tel: (202) 639-6000
Fax: (202) 639-6066

*Attorneys for Petitioner Saad Al Qahtani*

## Table of Contents

Index of Exhibits .......... ii

Table of Authorities .......... iii

Statement of Facts .......... 1

A. Respondents Detain Saad Indefinitely Because of a Statement by [redacted] .......... 1

B. Respondents Destroy the Abu Zubaydah Videotapes Just as the Supreme Court Accepts Another Guantánamo Case and Congress Debates the McCain Amendment. .......... 2

C. Respondents Assure This Court That They Would Not Sanction the Destruction of Torture Evidence. .......... 3

D. Respondents Reluctantly Acknowledge the Existence and Destruction of Interrogation Videotapes .......... 5

E. Petitioner Attempts to Resolve This Dispute With Respondents. .......... 6

Argument .......... 7

I. The Circumstances Under Which [redacted] Accused Saad Are Relevant to the Legality of Saad's Detention. .......... 7

II. Respondents Could and Did Anticipate This Litigation. .......... 9

III. This Court Should Order Respondents to Preserve Any Remaining Evidence Regarding the Treatment [redacted] .......... 11

Conclusion .......... 12

**Index of Exhibits**

| Exhibit | Description |
|---|---|
| A | Unclassified Notes of Client Meeting dated Dec. 21, 2007 |
| B | Excerpts from Ron Suskind, *The One Percent Doctrine: Deep Inside America's Pursuit of its Enemies Since 9/11* (New York 2006) |
| C | Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016 (Mar. 27, 2007) |
| D | Gordon England, Memorandum, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants detained at Guantánamo Bay Naval Base, Cuba* (July 29, 2004) |
| E | Mark Mazzetti, *9/11 Panel Study Finds that C.I.A. Withheld Tapes*, NYTIMES (Dec. 22, 2007) |
| F | Mark Mazzetti and Scott Shane, *Bush Lawyers Discussed Fate of C.I.A. Tapes*, NYTIMES (Dec. 19, 2007) |
| G | Mark Mazzetti, *C.I.A. Destroyed Tapes of Interrogations*, NYTIMES (Dec. 6, 2007) |
| H | Scott Shane and Mark Mazzetti, *Tapes by C.I.A. Lived and Died to Save Image*, NYTIMES (Dec. 30, 2007) |
| I | Press Release, *President Discusses Creation of Military Commissions to Try Suspected Terrorists* (Sept. 6, 2006) |
| J | Redacted Letter from Department of Justice to Fourth Circuit Court of Appeals and Hon. Leonie M. Brinkema dated Oct. 25, 2007 |
| K | CIA Press Release, *Director's Statement on the Taping of Early Detainee Interrogations* (Dec. 6, 2007) |
| L | Letter from Andrew I. Warden to Patricia A. Bronte dated Dec. 27, 2007 |
| M | Letter from Patricia A. Bronte to Andrew I. Warden dated January 3, 2008 |

## Table of Authorities

### Cases

*Brown v. Mississippi*, 297 U.S. 278 (1936) .....8

*Cobell v. Norton*, 224 F.R.D. 1 (D.D.C. 2004) .....11

*Hamdan v. Rumsfeld*, 546 U.S. 1002 (2005) .....2

*In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887 (D.C. Cir. 1999) .....8

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) .....7, 10, 11

*Miller v. Fenton*, 474 U.S. 104 (1985) .....7

*Rasul v. Bush*, 542 U.S. 466 (2004) .....2, 9

*Smith v. Café Asia*, 246 F.R.D. 19, 2007 U.S. Dist. LEXIS 73071 (D.D.C. Oct. 2, 2007) .....7

*United States v. Karake*, 443 F. Supp. 2d 8 (D.D.C. 2006) .....8

*United States v. Udechukwu*, 11 F.3d 1101 (1st Cir. 1993) .....8

### Federal Statutes

All Writs Act, 28 U.S.C. § 1651 .....11

Detainee Treatment Act, Pub. L. No. 109-148, §1003, 119 Stat. 2680, 2739-40 (2005) .....2, 3

Petitioner Saad Al Qahtani ("Saad"), by his counsel, submits this memorandum of law in support of his motion for an order directing Respondents and their counsel (a) to preserve all remaining evidence that is potentially relevant to Saad's challenge to the legality of his detention, and (b) to disclose certain information about the preservation, loss, or destruction of potentially relevant evidence in this case.

**Statement of Facts**

Saad Al Qahtani has been a prisoner at the Guantánamo Bay Naval Base for almost six years, since approximately January 16, 2002. He is a 29-year-old young man from Saudi Arabia and one of only 13 Saudi citizens who remain at Guantánamo. Saad has never been charged with any crime. Respondents claim the right to detain him indefinitely without charge.

**A. Respondents Detain Saad Indefinitely Because of a Statemen[redacted]**

According to his interrogator, the only reason Saad remains at Guantánamo today is that [redacted] The Central Intelligence Agency ("CIA") has long been rumored to have used waterboarding and other brutal methods in interrogating Abu Zubaydah – a man of questionable mental stability even before he was arrested in March 2002 and then interrogated for many months. (*See* Ron Suskind, *The One Percent Doctrine: Deep Inside America's Pursuit of its Enemies Since 9/11* at 99-100, 111, 115 (New York 2006), excerpts attached as Exhibit B.) Those brutal methods reportedly yielded abundant false intelligence. (*Id.*; *see also* Unclassified Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10016 (Mar. 27, 2007), Exhibit C at 23-24 (Abu Zubaydah's testimony that he gave false information to FBI or CIA interrogators so they would stop torturing him).)

On June 28, 2004, the Supreme Court held that Guantánamo prisoners like Saad have the right to challenge the legality of their detention by filing a petition for a writ of habeas corpus in federal district court. *Rasul v. Bush*, 542 U.S. 466, 485 (2004). A few days later, Deputy Secretary of Defense Paul Wolfowitz established a process for determining whether "multiple levels of review by military officers and officials of the Department of Defense" had correctly designated the Guantánamo prisoners as "enemy combatants." (CSRT Procedures, Exhibit D at 1 and Encl. 1, § B (July 29, 2004) (referencing Wolfowitz order of July 7, 2004).) On October 23, 2004, a panel of three military officers known as a Combatant Status Review Tribunal ("CSRT") concluded that Saad was an "enemy combatant" based on evidence concealed from Saad but presumed "genuine and accurate." (Factual Return, Dkt. 30-2 at 8-9 (CSRT's finding that government's unclassified evidence was "conclusory" and "not usable," thus necessitating reliance on classified evidence); Exhibit D, Encl. 1, § G(11) (requiring CSRT to presume genuineness and accuracy of evidence "submitted by the Recorder to support a determination that the detainee is an enemy combatant").) In this habeas proceeding, Respondents relied solely on the CSRT decision to justify Saad's indefinite detention at Guantánamo. (Factual Return, Dkt. 30-1 at 1.)

**B. Respondents Destroy the Abu Zubaydah Videotapes Just as the Supreme Court Accepts Another Guantánamo Case and Congress Debates the McCain Amendment.**

On November 7, 2005, the Supreme Court accepted certiorari in *Hamdan v. Rumsfeld*, a case challenging Respondents' procedures for trying "enemy combatants" for war crimes before military commissions and Respondents' refusal to accord Guantánamo prisoners their rights under the Geneva Conventions. 546 U.S. 1002 (2005). During November 2005, Congress debated the McCain Amendment to the Detainee Treatment Act of 2005, which prohibits the use of torture as an interrogation tool anywhere in the world. Detainee Treatment Act, Pub. L. No.

109-148, §1003, 119 Stat. 2680, 2739-40 (2005) ("DTA"). The DTA also provides a defense for Respondents' agents who previously employed interrogation techniques that were illegal but "officially authorized." *Id.* at § 1004(a). Finally, the DTA permits prisoners to appeal their CSRT decisions to the Court of Appeals for the District of Columbia Circuit. *Id.* at § 1005(e).

Also in November 2005, but unbeknownst to Saad or the American public, the CIA destroyed videotapes chronicling hundreds of hours of interrogations of Abu Zubaydah and another ghost detainee, Abd al-Rahim al-Nashiri. (*See* Mark Mazzetti, *9/11 Panel Study Finds that C.I.A. Withheld Tapes*, N.Y. TIMES (Dec. 22, 2007) (Exhibit E).) According to CIA officials, the CIA consulted with and received conflicting advice from top White House and Department of Justice lawyers before destroying the videotapes. (*See* Mark Mazzetti and Scott Shane, *Bush Lawyers Discussed Fate of C.I.A. Tapes*, N.Y. TIMES (Dec. 19, 2007) (Exhibit F).) One reported reason the CIA destroyed the videotapes was the potential legal liability of officials who authorized or utilized the harsh interrogation methods documented on the tapes. (*See* Mark Mazzetti, *C.I.A. Destroyed Tapes of Interrogations*, N.Y. TIMES (Dec. 6, 2007) (Exhibit G); Scott Shane and Mark Mazzetti, *Tapes by C.I.A. Lived and Died to Save Image*, N.Y. TIMES (Dec. 30, 2007) (Exhibit H).)

**C. Respondents Assure This Court That They Would Not Sanction the Destruction of Torture Evidence.**

On July 7, 2006, Petitioners moved this Court for an order requiring Respondents to preserve all evidence regarding the Petitioners. (Dkt. 36.) Respondents opposed the motion for a preservation order on three grounds. First, Respondents argued that the Court lacked jurisdiction to order Respondents to preserve evidence. (Respondents' Opposition, Dkt. 37 at 3.) Second, Respondents argued that the requested order was overbroad and unduly burdensome. (*Id.* at 7-8.) Third, Respondents argued that "a preservation order is unnecessary" in this case

because Respondents were already collecting and preserving evidence as part of their "investigations . . . into possible misconduct in regard to mistreatment of detainees." (*Id.* at 6.) Respondents assured the Court that they "would not compromise those investigations or prosecutions by destroying or sanctioning the destruction of documents pertinent to such investigations." (*Id.*) Respondents did not inform the Court that the CIA had destroyed the Abu Zubaydah videotapes in November 2005.

On July 25, 2006, this Court granted Petitioners' motion and ordered that:

> Respondents shall preserve and maintain all evidence, documents and information, without limitation, now or ever in respondents' possession, custody or control, regarding the detained petitioners in this case.

(Order, Dkt. 41 at 5.) The Court rejected Respondents' argument that the preservation order was overbroad or excessively burdensome:

> Documents reflecting treatment of detainees – whether statements of official policy, cumulative evidence of specific practices, or something else – may be probative of the treatment of petitioners or may lead to other probative evidence. The requested order imposes no greater obligation on respondents than the federal discovery rules' preservation obligations impose on a litigant in a typical civil lawsuit.

(*Id.* at 3.)

In a speech to the nation on September 6, 2006, Respondent Bush admitted that the CIA had held Abu Zubaydah in a secret foreign prison for four and one-half years and that the CIA had employed "enhanced interrogation techniques" to extract information from Abu Zubaydah. (*See* Press Release, *President Discusses Creation of Military Commissions to Try Suspected Terrorists* (Sept. 6, 2006) (Exhibit I).)

**D. Respondents Reluctantly Acknowledge the Existence and Destruction of Interrogation Videotapes.**

On October 25, 2007, the Department of Justice informed the Fourth Circuit Court of Appeals and United States District Judge Leonie Brinkema that two declarations by the CIA, previously filed in *United States v. Moussaoui*, were false because, in fact, the CIA possessed two videotapes and one audiotape of interrogations of "enemy combatants." (A redacted copy of the Department of Justice letter is attached as Exhibit J.) The identity of the "enemy combatants" was redacted from the publicly available version of the letter. The Department of Justice reviewed the two videotapes and the audiotape in September and October 2007, and these recordings apparently still exist. (Exhibit J at 2.) The CIA has completed an "exhaustive review to determine whether it was in possession of any other such recordings for any of the enemy combatant witnesses at issue" in the *Moussaoui* case. (*Id.*) The Department of Justice letter does not mention the videotapes that the CIA destroyed in November 2005.

On December 6, 2007, CIA Director General Michael V. Hayden publicly acknowledged that the CIA had videotaped interrogations of Abu Zubaydah and Abd al-Rahim al-Nashiri in 2002 and then destroyed those videotapes in November 2005. (Press Release, *Director's Statement on the Taping of Early Detainee Interrogations* (Dec. 6, 2007) (Exhibit K).) Hayden disclosed the existence and destruction of the videotapes only because the New York Times had alerted him that the paper was about to report on the tapes. (*See id.*; Exhibit G.) Hayden stated that:

> The tapes were meant chiefly as an additional, internal check on the [interrogation] program in its early stages. . . . The Agency soon determined that its documentary reporting was full and exacting, removing any need for tapes.
>
> . . . [T]he Office of General Counsel examined the tapes . . . The Office of Inspector General also examined the tapes in 2003 . . . Beyond their lack of intelligence value – as the interrogation sessions had already been

> exhaustively detailed in written channels – and the absence of any legal or internal reason to keep them, the tapes posed a serious security risk. . . .

(Exhibit K.) Despite the purported security risk, the videotapes were housed continuously in an overseas CIA office from 2002 until their destruction in November 2005. (Exhibit F.)

**E. Petitioner Attempts to Resolve This Dispute With Respondents.**

On December 19, 2007, Saad's counsel delivered a letter to Respondents' counsel outlining the above facts and requesting information regarding the preservation, loss, or destruction of evidence relating to [REDACTED] statements against Saad. Petitioner also requested assurances of the specific measures Respondents now have implemented to ensure the preservation of remaining evidence. Petitioner did not request production of the evidence itself, but merely requested information and assurances regarding Respondents' preservation of the evidence.[1]

On December 27, 2007, Respondents sent Petitioner's counsel a letter stating that Respondents were "in the process of considering the points about which [Petitioner] inquire[d]," but needed more time before responding to the December 19 letter. (Exhibit L.) On January 3, 2008, Petitioner's counsel asked Respondents' counsel whether Respondents intended to provide a substantive response to the December 19 letter, and when Petitioner could expect to receive a response. Respondents' counsel was unable to say when or if Respondents would respond to Petitioner's inquiries. (Exhibit M.)

[1] Out of an abundance of caution, Petitioner's counsel conveyed the letter to Respondents' counsel through the Court Security Officer. For the same reason, a copy of the letter is not attached to this memorandum, but will be provided to the Court in a separate filing through the Court Security Officer.

## Argument

"A party is obliged to preserve potentially relevant evidence once he anticipates litigation." *Smith v. Café Asia*, 246 F.R.D. 19, 2007 U.S. Dist. LEXIS 73071, at *5 n.1 (D.D.C. Oct. 2, 2007) (ordering preservation of sexually explicit images on plaintiff's cell phone and disclosure of images to one defense attorney); *accord Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). Respondents had a duty to preserve the Abu Zubaydah videotapes because they are plainly relevant to this case, and Respondents should have anticipated – and did anticipate – this litigation long before they destroyed the videotapes. As a result, this Court should take appropriate measures to ensure that Respondents preserve all remaining evidence relevant to this litigation.

### I. The Circumstances Under Which [redacted] Accused Saad Are Relevant to the Legality of Saad's Detention.

The destroyed videotapes contained crucial and unique evidence of the credibility [redacted]

The relevance of such evidence is beyond dispute. Nothing is more fundamental to our justice system than a deep abhorrence for imprisoning a person based on statements extracted by torture. For that reason, federal courts have long held that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned . . . ." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Coerced statements are inadmissible for two independent reasons: they are untrustworthy, and the methods used to procure them are repugnant to American values.

*United States v. Karake*, 443 F. Supp. 2d 8, 50-51, 94 (D.D.C. 2006) (holding that defendants' statements were not voluntary because they "were extracted only after countless hours of repetitive questioning over a period of many months, during which time they were subjected to periods of solitary confinement, positional torture, and repeated physical abuse"). "The rack and torture chamber may not be substituted for the witness stand." *Brown v. Mississippi*, 297 U.S. 278, 285-86 (1936).

Even if the "enhanced interrogation techniques" applied to Abu Zubaydah did not amount to torture, [redacted] Coercion need not rise to the level of torture to cast doubt on the reliability of a witness's statements. Indeed, perfectly lawful inducements – such as cooperation agreements with the government – are relevant to witness credibility. *See In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 896 (D.C. Cir. 1999) (holding that prosecutors were obliged to disclose to defense any cooperation agreements witness had with prosecutors, FBI, or DEA in other cases); *see also United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993) (reversing conviction because prosecution committed "severe and deliberate" *Brady* violation by not disclosing evidence to support coercion defense).

Respondents cannot seriously dispute the potential relevance o[redacted]

## II. Respondents Could and Did Anticipate This Litigation.

From the moment that Respondents decided to transport prisoners to Guantánamo, Respondents knew that the prisoners would attempt to challenge their imprisonment in court. Indeed, that was a primary reason for confining the prisoners at Guantánamo instead of a prison within the continental United States. But if there were ever any doubt that litigation would ensue, all doubt was erased in June 2004 when the Supreme Court decided *Rasul* and held that Guantánamo prisoners had the right to pursue habeas proceedings in this Court.

Moreover, one year before destroying the Abu Zubaydah videotapes, Respondents themselves instituted proceedings to which the videotapes were relevant. In October 2004, Respondents conducted proceedings to "determine" whether Saad was an "enemy combatant." Under the CSRT rules, the panel had the discretion to "consider hearsay evidence, taking into account the reliability of such evidence in the circumstances." (Exhibit D, Encl. 1, § G(7).) Thus, to the extent the panel considered an[REDACTED] the panel had a duty to evaluate the statement's reliability by examining the circumstances under which it was made. [REDACTED] In addition, the CSRT Recorder (who functioned as a quasi prosecutor) was obliged to collect and present to the military panel any evidence that would "suggest that the detainee should not be designated as an enemy combatant." (*Id.* at Encl. 1, § H(4) and (5), Encl. 2, § B(1).) [REDACTED]

Respondents' duty to preserve the Abu Zubaydah videotapes arose long before this action was filed in December 2005.[2] The Second Circuit Court of Appeals decision in *Kronisch v. United States* is instructive. The plaintiff in *Kronisch* alleged that in October 1952 he became an unwitting victim of a secret CIA program to test the effects of LSD as an interrogation tool. 150 F.3d at 116. In 1973, two senior CIA officials directed and approved the destruction of all files relating to the secret program. *Id.* at 118. The plaintiff began writing letters to the CIA and government officials in the late 1970s; he filed an administrative claim against the CIA in 1981; and he filed suit in 1983. *Id.* at 120. The defendants argued that they had no duty to preserve the files because "no litigation, administrative action, or congressional investigation had commenced" as of 1973 when the files were destroyed. *Id.* at 127. The court rejected that argument, holding that the duty to preserve evidence arises not only when litigation has been filed, but also "when a party should have known that the evidence may be relevant to future litigation." *Id.* at 126.

The CIA officials also claimed that their reasons for destroying the files "had nothing to do with the fear of future litigation." *Id.* at 127. The officials' stated reasons were "to preserve the confidential identities of outside participants in the . . . program, to prevent incomplete documents from being misunderstood, and to prevent paper overflow[.]" *Id.* Both the district and appellate courts had difficulty accepting these reasons and, in particular, that the officials "were concerned only with the effect of disclosure on other persons connected to the drug program, and not with the possible consequences to themselves or to the CIA." *Id.*

---

[2] The filing of many Guantánamo habeas actions was delayed because Respondents prevented the prisoners from meeting or communicating with lawyers unless the lawyers could first prove that the prisoners – who were being held incommunicado – had personally authorized the representation. *See* Dkt. 9-1 at 3-4, 13 (Respondents' circular argument that this Court lacked authority to permit counsel to speak or correspond with three Petitioners because they did not "directly" authorize counsel to represent them); Dkt. 21 at 2 (same); Dkt. 26-1 at 2 (same).

In this case, just as in *Kronisch*, the government and the CIA had a duty to preserve evidence relevant to potential claims against them. Indeed, unlike in *Kronisch*, litigation here was a virtual certainty. The videotapes were destroyed *after* the Supreme Court upheld the prisoners' right to file suit, *after* the CSRT proceedings, and just as the Congress was debating the anti-torture and judicial review provisions of the DTA. Regardless of their reasons, Respondents violated their duty to preserve the videotapes.

**III. This Court Should Order Respondents to Preserve Any Remaining Evidence Regarding the Treatment**

This Court has the authority to issue orders "in aid of its fact-finding obligations in habeas corpus proceedings . . . as the circumstances require for a proper and just disposition." (Order, Dkt. 41 at 2 (citing 28 U.S.C. § 1651).) Respondents' conduct demonstrates that greater transparency and oversight by this Court are necessary to ensure that additional evidence is not lost or destroyed. *See Cobell v. Norton*, 224 F.R.D. 1, 7 (D.D.C. 2004) (holding that Interior Department's failure to report water and mold damage to trust fund records demonstrated a need for "judicial oversight"). Not only did Respondents fail to preserve the videotapes and fail to inform the Court of their destruction; Respondents affirmatively assured the Court that they "would not compromise their investigations or prosecutions [of mistreatment of detainees] by destroying or sanctioning the destruction of documents pertinent to such investigations." (Dkt. 37 at 6.)

Having destroyed the videotapes, Respondents now have a heightened duty to preserve any remaining evidence that reflects the interrogation methods used against

The best way to ensure that Respondents perform this duty is to require Respondents to inform the Court of what evidence remains and what measures are being taken to preserve it.

**Conclusion**

For all of the foregoing reasons, Petitioner respectfully requests that the Court order Respondents and their counsel (a) to preserve all remaining evidence that is potentially relevant to Saad's challenge to the legality of his detention, including evidence that bears on the [REDACTED] and (b) to disclose to the Court and Petitioner's counsel information regarding the preservation, loss, or destruction of potentially relevant evidence, subject to any security measures the Court deems appropriate.

Dated: January 7, 2008

Respectfully submitted,

Patricia A. Bronte

One of the Attorneys for the Petitioner Saad Al Qahtani

David W. DeBruin (DDC Bar No. 337626)
JENNER & BLOCK LLP
601 Thirteenth Street, N.W., Suite 1200
Washington, DC 20005-3823
Tel: (202) 639-6000
Fax: (202) 639-6066

Patricia A. Bronte
Sapna G. Lalmalani
JENNER & BLOCK LLP
330 North Wabash Ave.
Chicago, IL 60611
Tel: (312) 923-8357
Fax: (312) 840-7757

*Of Counsel*
Gitanjali S. Gutierrez (GG1234)
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464
Fax: (212) 614-6499

DEC-21-2007 13:30 P.01

UNCLASSIFIED

SECURE FACILITY

21-DEC-07

# HABEAS COUNSEL FAX COVER SHEET

FROM:

FAXED BY 

TO:

NAME: Patricia Bronte

ORG:

PHONE: (312) 923-8357

FAX: (312) 840-7757

COMMENTS:

Total Number of Pages Sent (including cove sheet) 2

*Please telephone (703) 601-4500 if there were any problems with this transmission.*

UNCLASSIFIED

To: Privilege Team
Fr: Patricia A. Bronte
pbronte@jenner.com
FAX: 312-840-7757
Date: December 21, 2007
Re: ISN 200

On December 17, 2007, I met with my client Saad Al Qahtani, ISN 200. It was his 29th birthday, and he has been at Guantánamo since January 16, 2002. That morning the interrogators had thrown him a birthday party, complete with chocolate cake (but no candles). Unfortunately, I had to deliver the sad news of the deaths of his mother and grandmother. (His father died 20 years ago.)

Saad told me that his interrogator recently said that the only reason he is still at Guantánamo is that [redacted]