# Exhibit H

**The New York Times** 

December 30, 2007

# Tapes by C.I.A. Lived and Died to Save Image

By SCOTT SHANE and MARK MAZZETTI

WASHINGTON — If Abu Zubaydah, a senior operative of Al Qaeda, died in American hands, Central Intelligence Agency officers pursuing the terrorist group knew that much of the world would believe they had killed him.

So in the spring of 2002, even as the intelligence officers flew in a surgeon from Johns Hopkins Hospital to treat Abu Zubaydah, who had been shot three times during his capture in Pakistan, they set up video cameras to record his every moment: asleep in his cell, having his bandages changed, being interrogated.

In fact, current and former intelligence officials say, the agency's every action in the prolonged drama of the interrogation videotapes was prompted in part by worry about how its conduct might be perceived — by Congress, by prosecutors, by the American public and by Muslims worldwide.

That worry drove the decision to begin taping interrogations — and to stop taping just months later, after the treatment of prisoners began to include waterboarding. And it fueled the nearly three-year campaign by the agency's clandestine service for permission to destroy the tapes, culminating in a November 2005 destruction order from the service's director, Jose A. Rodriguez Jr.

Now, the disclosure of the tapes and their destruction in 2005 have become just the public spectacle the agency had sought to avoid. To the already fierce controversy over whether the Bush administration authorized torture has been added the specter of a cover-up.

The Justice Department, the C.I.A.'s inspector general and Congress are investigating whether any official lied about the tapes or broke the law by destroying them. Still in dispute is whether any White House official encouraged their destruction and whether the C.I.A. deliberately hid them from the national Sept. 11 commission.

But interviews with two dozen current and former officials, most of whom would speak about the classified program only on the condition of anonymity, revealed new details about why the tapes were made and then eliminated. Their accounts show how political and legal considerations competed with intelligence concerns in the handling of the tapes.

The discussion about the tapes took place in Congressional briefings and secret deliberations among top White House lawyers, including a meeting in May 2004 just days after photographs of abuse at Abu Ghraib prison in Iraq had reminded the administration of the power of such images. The debate stretched over the tenure of two C.I.A. chiefs and became entangled in a feud between the agency's top lawyers and its inspector general. The tapes documented a program so closely guarded that President Bush himself had agreed with the advice of intelligence officials that he not be told the locations of the secret C.I.A. prisons. Had there been

no political or security considerations, videotaping every interrogation and preserving the tapes would make sense, according to several intelligence officials.

"You couldn't have more than one or two analysts in the room," said A. B. Krongard, the C.I.A.'s No. 3 official at the time the interrogations were taped. "You want people with spectacular language skills to watch the tapes. You want your top Al Qaeda experts to watch the tapes. You want psychologists to watch the tapes. You want interrogators in training to watch the tapes."

Given such advantages, why was the taping stopped by the end of 2002, less than a year after it started?

"By that time," Mr. Krongard said, "paranoia was setting in."

The Decision to Tape

By several accounts, the decision to begin taping Abu Zubaydah and another detainee suspected of being a Qaeda operative, Abd al-Rahim al-Nashiri, was made in the field, with several goals in mind.

First, there was Abu Zubaydah's precarious condition. "There was concern that we needed to have this all documented in case he should expire from his injuries," recalled one former intelligence official.

Just as important was the fact that for many years the C.I.A. had rarely conducted even standard interrogations, let alone ones involving physical pressure, so officials wanted to track closely the use of legally fraught interrogation methods. And there was interest in capturing all the information to be gleaned from a rare resource — direct testimony from those who had attacked the United States.

But just months later, the taping was stopped. Some field officers had never liked the idea. "If you're a case officer, the last thing you want is someone in Washington second-guessing everything you did," said one former agency veteran.

More significant, interrogations of Abu Zubaydah had gotten rougher, with each new tactic approved by cable from headquarters. American officials have said that Abu Zubaydah was the first Qaeda prisoner to be waterboarded, a procedure during which water is poured over the prisoner's mouth and nose to create a feeling of drowning. Officials said they felt they could not risk a public leak of a videotape showing Americans giving such harsh treatment to bound prisoners.

Heightening the worries about the tapes was word of the first deaths of prisoners in American custody. In November 2002, an Afghan man froze to death overnight while chained in a cell at a C.I.A. site in Afghanistan, north of Kabul, the capital. Two more prisoners died in December 2002 in American military custody at Bagram Air Base in Afghanistan.

By late 2002, interrogators were recycling videotapes, preserving only two days of tapes before recording over them, one C.I.A. officer said. Finally, senior agency officials decided that written summaries of prisoners' answers would suffice.

Still, that decision left hundreds of hours of videotape of the two Qaeda figures locked in an overseas safe.

Clandestine service officers who had overseen the interrogations began pushing hard to destroy the tapes. But George J. Tenet, then the director of central intelligence, was wary, in part because the agency's top lawyer, Scott W. Muller, advised against it, current and former officials said.

Yet agency officials decided to float the idea of eliminating the tapes on Capitol Hill, hoping for political cover. In February 2003, Mr. Muller told members of the House and Senate oversight committees about the C.I.A's interest in destroying the tapes for security reasons.

But both Porter J. Goss, then a Republican congressman from Florida and the chairman of the House Intelligence Committee, and Representative Jane Harman of California, the ranking Democrat, thought destroying the tapes would be legally and politically risky. C.I.A. officials did not press the matter.

The Detention Program

Scrutiny of the C.I.A.'s secret detention program kept building. Later in 2003, the agency's inspector general, John L. Helgerson, began investigating the program, and some insiders believed the inquiry might end with criminal charges for abusive interrogations.

Mr. Helgerson — now conducting the videotapes review with the Justice Department — had already rankled covert officers with an investigation into the 2001 shooting down of a missionary plane by Peruvian military officers advised by the C.I.A. The investigation set off widespread concern within the clandestine branch that a day of reckoning could be coming for officers involved in the agency's secret prison program. The Peru investigation often pitted Mr. Helgerson against Mr. Muller, who vigorously defended members of the clandestine branch and even lobbied the Justice Department to head off criminal charges in the matter, according to former intelligence officials

"Muller wanted to show the clandestine branch that he was looking out for them," said John Radsan, who served as an assistant general counsel for the C.I.A. from 2002 to 2004. "And his aggressiveness on Peru was meant to prove to the operations people that they were protected on a lot of other programs, too."

Mr. Helgerson completed his investigation of interrogations in April 2004, according to one person briefed on the still-secret report, which concluded that some of the C.I.A.'s techniques appeared to constitute cruel, inhuman and degrading treatment under the international Convention Against Torture. Current and former officials said the report did not explicitly state that the methods were torture.

A month later, as the administration reeled from the Abu Ghraib disclosures, Mr. Muller, the agency general counsel, met to discuss the report with three senior lawyers at the White House: Alberto R. Gonzales, the White House counsel; David S. Addington, legal adviser for Vice President Dick Cheney; and John B. Bellinger III, the top lawyer at the National Security Council.

The interrogation tapes were discussed at the meeting, and one Bush administration official said that, according to notes of the discussion, Mr. Bellinger advised the C.I.A. against destroying the tapes. The positions Mr. Gonzales and Mr. Addington took are unknown. One person familiar with the discussion said that in light of concerns raised in the inspector general's report that agency officers could be legally liable for harsh interrogations, there was a view at the time among some administration lawyers that the tapes should

be preserved.

Looking for Guidance

After Mr. Tenet and Mr. Muller left the C.I.A. in mid-2004, Mr. Rodriguez and other officials from the clandestine branch decided again to take up the tapes with the new chief at Langley, Mr. Goss, the former congressman.

Mr. Rodriguez had taken over the clandestine directorate in late 2004, and colleagues say Mr. Goss repeatedly emphasized to Mr. Rodriguez that he was expected to run operations without clearing every decision with superiors.

During a meeting in Mr. Goss's office with Mr. Rodriguez, John A. Rizzo, who by then had replaced Mr. Muller as the agency's top lawyer, told the new C.I.A. director that the clandestine branch wanted a firm decision about what to do with the tapes.

According to two people close to Mr. Goss, he advised against destroying the tapes, as he had in Congress, and told Mr. Rizzo and Mr. Rodriguez that he thought the tapes should be preserved at the overseas location. Apparently he did not explicitly prohibit the tapes' destruction.

Yet in November 2005, Congress already was moving to outlaw "cruel, inhuman and degrading" treatment of prisoners, and The Washington Post reported that some C.I.A. prisoners were being held in Eastern Europe. As the agency scrambled to move the prisoners to new locations, Mr. Rodriguez and his aides decided to use their own authority to destroy the tapes, officials said.

One official who has spoken with Mr. Rodriguez said Mr. Rodriguez and his aides were concerned about protection of the C.I.A. officers on the tapes, from Al Qaeda, as the C.I.A. has stated, and from political pressure.

The tapes might visually identify as many as five or six people present for each interrogation — interrogators themselves, whom the agency now prefers to call "debriefers"; doctors or doctor's assistants who monitored the prisoner's medical state; and security officers, the official said. Some traveled regularly in and out of areas where Al Qaeda and other Islamist extremists are active, he said.

Apart from concerns about physical safety in the event of a leak, the official said, there was concern for the careers of officers shown on the tapes. "We didn't want them to become political scapegoats," he said.

According to several current and former officials, lawyers in the agency's clandestine branch gave Mr. Rodriguez written guidance that he had the authority to destroy the tapes and that such a move would not be illegal.

One day in November 2005, Mr. Rodriguez sent a cable ordering the destruction of the recordings. Soon afterward, he notified both Mr. Goss and Mr. Rizzo, taking full responsibility for the decision.

Former intelligence officials said that Mr. Goss was unhappy about the news, in part because it was further evidence that as the C.I.A. director he was so weakened that his subordinates would directly reject his advice.

Tapes by C.I.A. Lived and Died to Save Image - New York Times
Case 1:05-cv-02384-UNA   Document 81   Filed 01/28/2008   Page 6 of 6
Page 5 of 5

Yet it appears that Mr. Rodriguez was never reprimanded. Nor is there evidence that Mr. Goss promptly notified Congress that the tapes were gone.

The investigations over the tapes frustrate some C.I.A. veterans, who say they believe that the agency is being unfairly blamed for policies of coercive interrogation approved at the top of the Bush administration and by some Congressional leaders. Intelligence officers are divided over the use of such methods as waterboarding. Some say the methods helped get information that prevented terrorist attacks. Others, like John C. Gannon, a former C.I.A. deputy director, say it was a tragic mistake for the administration to approve such methods.

Mr. Gannon said he thought the tapes became such an issue because they would have settled the legal debate over the harsh methods.

"To a spectator it would look like torture," he said. "And torture is wrong."

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map